# IN THE SUPREME COURT OF TEXAS

═══════════
No. 10-0316
═══════════

CITY OF AUSTIN, PETITIONER,

v.

HARRY M. WHITTINGTON, ET AL., RESPONDENTS.

═══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════

**Argued December 6, 2011**

JUSTICE GUZMAN delivered the opinion of the Court in which CHIEF JUSTICE JEFFERSON, JUSTICE WAINWRIGHT, JUSTICE MEDINA, JUSTICE GREEN, JUSTICE JOHNSON and JUSTICE LEHRMANN joined.

JUSTICE HECHT filed a concurring and dissenting opinion, in which JUSTICE WILLETT joined.

In this appeal from the City of Austin's (City) condemnation of property to build a parking garage for a nearby convention center and a facility to chill water to cool nearby buildings, we examine and define the scope of judicial review of legislative takings. The Texas Constitution and the Local Government Code authorize takings by municipalities when the municipality determines the property is necessary for a public use and provides just compensation to the owner. TEX. CONST. art. I, § 17; TEX. LOC. GOV'T CODE § 251.001(a). We have long held that judicial review is proper to challenge a taking on the basis of fraud, bad faith, or arbitrary and capricious determinations by

the condemnor. Today we reaffirm that principle. On judicial review of the City's taking, the property owners alleged that the City's determination that the property was necessary for public use was fraudulent, in bad faith, and arbitrary and capricious. The jury agreed, the trial court entered judgment on the verdict (invalidating the taking), and the court of appeals affirmed. __ S.W.3d __. Because we conclude that the City's determinations were not fraudulent, in bad faith, or arbitrary and capricious, we reverse the judgment of the court of appeals and remand for entry of judgment in accordance with this opinion.

## I. Procedure for Takings

Article I, section 17 of the Texas Constitution requires that condemned property be taken for a public use and be justly compensated: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by consent of such person . . . ." TEX. CONST. art. I, § 17. The Local Government Code imposes an additional restriction on municipal takings. Section 251.001 of the Local Government Code adds that the condemnor must consider the taking necessary for public use: "When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public purpose to acquire public or private property . . . for any other municipal purpose the governing body considers advisable." TEX. LOC. GOV'T CODE § 251.001(a). In short, these provisions require the municipality to demonstrate: (1) it intends to put the property to public use (the public use requirement); and (2) the condemnation is necessary to advance or achieve that public use (the necessity requirement).

2

Procedurally, the condemnor typically negotiates with the landowner to purchase the property. *See Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 179 (Tex. 2004); TEX. PROP. CODE §§ 21.0112(a), 21.012(a). If they are unable to agree on damages, the condemnor files a condemnation petition in county or district court. TEX. PROP. CODE §§ 21.001, 21.012, 21.013; *Hubenak*, 141 S.W.3d at 179. The petition must, among other things, describe the property to be condemned and the purpose for which the condemnor intends to use the property. TEX. PROP. CODE § 21.012(b). The judge of the court then appoints "'three disinterested freeholders who reside in the county as special commissioners to assess the damages.'" *Hubenak*, 141 S.W.3d at 179 (quoting TEX. PROP. CODE § 21.014). The special commissioners hold a hearing to assess the value of the property to be condemned (and any damage to the remainder). TEX. PROP. CODE §§ 21.014–.015; *Hubenak*, 141 S.W.3d at 179.

If any party files written objections to the special commissioners' findings with the court, "'the court shall cite the adverse party and try the case in the same manner as other civil causes.'" *Hubenak*, 141 S.W.3d at 179 (quoting TEX. PROP. CODE § 21.018). During that litigation, the condemnor may take possession of the condemned property by paying the damages determined by the special commissioners and executing a bond approved by the court to secure payment of potential additional costs that could be awarded at trial or on appeal. TEX. PROP. CODE § 21.021(a).

## II. Factual Background

Harry Whittington and members of his family (collectively "the Whittingtons") acquired Block 38 in Austin, Texas in 1981. Block 38 is cater-cornered to the Austin convention center and was used for surface parking. The City opened the convention center in 1992. An 1,100 space

parking garage a block west of the west entrance to the convention center has 600 spaces to serve the convention center and 500 spaces for monthly leases. In 1998, Austin voters approved an expansion to the convention center to more than double its size, financed by an increase in the hotel tax. That expansion was completed in 2002 and added an entrance on the north side.

After the expansion, a feasibility study indicated a lack of hotel rooms in close proximity to the convention center. The City sought to address not only the hotel room issue but also the need for additional parking after the doubling in size of the convention center. The City sought to add approximately 500 parking spaces near the new north entrance to the convention center.

The City pursued a project that would include an 800-room hotel, residential space, retail shops, and underground parking that could support the expanded convention center. In 1998, the City began the process of selecting a developer to design and build the hotel project. The City chose H.L. Hotels, LLC (a venture between Hilton Hotel Corp. and Landmark Organization, Inc.) as the developer in July 1999.

The City created Austin Convention Enterprises, Inc., a nonprofit public facility corporation that issued tax exempt bonds to fund the project.[1] The City also granted $15 million toward the project from convention center revenue. *See* TEX. LOC. GOV'T CODE § 380.001(a). The construction and financing for the project cost approximately $280 million. The developer received a 4.5% fee

---

[1] Municipal bonds are often used to finance public capital projects. SECURITIES INDUSTRY & FINANCIAL MARKETS ASSOCIATION, THE FUNDAMENTALS OF MUNICIPAL BONDS 1 (6th ed. 2012). The municipality, or an authority it creates, issues or sells the bonds to raise proceeds to perform the capital improvement. *Id*. at 2, 4. The municipality then pays the holder of the bond the agreed interest (called a coupon) on a fixed schedule, either through the municipality's general revenue or a specific revenue stream. *Id*. at 1, 3, 24. The bonds issued for the hotel project were funded through the revenue stream of the hotel project. The municipality sometimes uses a sinking fund to collect revenue to repay the principal to the holder when the bond matures, typically in 1 to 30 years. *Id*. at 23, 51.

(of the construction portion for the project) in the form of third-tier bonds, totaling approximately $10.5 million. After the project bonds are retired in 26–30 years from their issuance, the City will own the hotel (which accounts for 73.52% of the project) and the developer will own the residential and retail portions (which account for 26.48% of the project).

Before H.L. Hotels broke ground on the project, the City was investigating ways to make the project's debt coverage ratios more favorable (such as increasing revenue or decreasing expenses) to allow the project bonds to sell on favorable terms. The City had planned to build an underground garage with 500 spaces to support the hotel and another 500 spaces to support the expanded convention center. That plan required the garage to extend to the street on three sides and underneath the street on the west side. However, the close proximity to a train corridor on the south side of the project and a park on the west side of the project prevented construction of as wide of a garage as planned and the project encountered water at the fourth level of excavation—making it less feasible to excavate deeper to accommodate for the smaller footprint of the garage. In October 1999, the City determined that building a smaller garage was the most feasible option for lowering the overall project cost in order to obtain favorable financing. The City's decision to build a smaller garage had the practical effect of reducing the hotel project budget by $10–12 million.[2] H.L. Hotels broke ground in June 2001 and completed the project in December 2003.

_____

[2] The Whittingtons state in their briefing that H.L. Hotels benefitted from the decision to not build the larger underground garage. However, there is no evidence in the record to support this assertion. The Whittingtons did not call the project developer or an expert to testify as to any alleged benefit the developer might have received. When counsel for the Whittingtons asked the convention center director if the project would take less time to complete with the smaller underground garage, he testified that he did not know. The only evidence of any impact on the developer was that the project cost was reduced by $10-12 million, which would have resulted in a lesser fee to the developer of at least $450,000 in light of its 4.5% fee.

5

The City sought to acquire land elsewhere to build a garage to serve the expanded convention center. The City looked at acquiring Block 38 or a vacant block three blocks south of Block 38. City staff considered but decided against cancelling the 500 leases in the existing garage near the west side of the convention center because it relied on the steady stream of income from the monthly leases and the garage and its elevator were not located near the new north entrance to the convention center. The City chose to try to acquire Block 38 because of its close proximity to the north convention center entrance. At the time, the Whittingtons were leasing half of Block 38 to the City for convention center parking.

In 2001, Austin Energy, the municipal utility department of the City, approached City convention center staff about constructing a district cooling plant near the expanded convention center. A district cooling plant provides chilled water to cool the air in nearby buildings. Utilities use district cooling plants to shift the demand for electricity from peak usage hours during the day time to off-peak hours at night to freeze water. During the day, the melting ice chills water that is piped to cool nearby buildings. By shifting energy demand to off-peak hours, utilities are able to avoid building more power plants. District cooling is not regulated by the Public Utility Commission or the City Council.

Austin Energy previously built a district cooling plant on the west side of downtown Austin (District Plant 1). A loop of pipes connects the plant to the buildings it cools, including the convention center and expansion. Austin Energy predicted that District Plant 1 would reach full capacity in 2005, but later revised that estimate to 2007 after the economy slowed and fewer buildings used the program. However, Austin Energy was contractually obligated to meet more

6

demand than was actually occurring at the time. Austin Energy also sought to build a second district plant to be able to serve its customers if District Plant 1 required down time.

Austin Energy entered an agreement with the convention center department for the department to find a suitable location for a second district plant (District Plant 2). The agreement set out guidelines for a suitable location. Austin Energy preferred a location near the east portion of the chilled water loop for two main reasons. First, proximity to the loop was a significant factor because laying the pipe to connect to the loop costs around $1,500 per linear foot. Second, farther distances between the loop and District Plant 2 would require more pump horsepower to achieve sufficient flow of chilled water.

In addition to Block 38, the City considered several other properties for District Plant 1.[3] The City decided to acquire Block 38 to support a parking garage for the expanded convention center and District Plant 2. The garage would occupy 70% of the block and the cooling plant would occupy the remaining 30%.

The City and the Whittingtons could not agree on a price for Block 38, so the City Council passed a resolution in August 2001 authorizing a condemnation suit to acquire Block 38.[4] On October 17, 2001, the City wrote a final offer letter to the Whittingtons. The letter stated that the "plant will be used to provide chilled water necessary to operate the air conditioning systems of the Convention Center Expansion and" the hotel project. The project manager for District Plant 2, in

---

[3] Those other properties included: (1) 5th Street and San Jacinto Boulevard; (2) East Cesar Chavez and Red River Street, (3) 5th Street and Lamar Boulevard; and (4) several vacant lots the City owned east of Interstate Highway 35.

[4] The City Council passed previous condemnation resolutions, but the earlier resolutions had procedural defects.

7

an email to the author of that letter, noted that, "to be completely clear, someone's pointed out that actually those buildings are currently going to be served from [District Plant 1] until the new plant is built . . . . So this new plant is not absolutely necessary for operation of the buildings mentioned but a redundancy is much better." District Plant 1 provided service to the convention center expansion and the hotel project for some time even after District Plant 2 became operational.

The City filed a condemnation suit in October 2001. The trial court appointed three special commissioners, who awarded the Whittingtons $7,650,000. Both parties filed objections to the award. The City deposited that amount into the registry of the court in January 2002 and took possession of Block 38. TEX. PROP. CODE § 21.021. The City then spent $15–18 million building a 740-space parking garage on 70% of Block 38, which opened in February 2005, and constructed District Cooling Plant 2 on the remaining portion of Block 38.

The trial court granted the City's motion for partial summary judgment concluding there were no genuine issues of material fact on the City's right to take Block 38. The Whittingtons also asserted that the City had not condemned the twenty-foot strip of land bisecting Block 38.[5] The jury awarded $7,750,000 in damages, and the trial court entered judgment on that award. The judgment specified that, as a county court, the trial court lacked authority to decide matters regarding title and made no determination on whether the City also took the twenty-foot strip. The court of appeals determined that the City failed to meet its summary judgment burden as to either public use or

---

[5] The twenty-foot strip of land is essentially an alley but has never been used by the public as an alley.

necessity. *Whittington v. City of Austin*, 174 S.W.3d 889, 906 (Tex. App.—Austin 2005, pet. denied) (*Whittington I*).

Shortly before the Whittingtons filed that appeal, they filed a declaratory judgment action in district court. The district court determined that the City had not condemned the twenty-foot strip of land bisecting Block 38. On appeal, the court of appeals held that the county court judgment, which failed to adjudicate the issue of the twenty-foot strip, was not final and the district court did not have jurisdiction to review that judgment. *City of Austin v. Whittington*, __ S.W.3d __, __ (Tex. App.—Austin 2007, no pet.) (*Whittington II*). The court of appeals vacated the district court judgment and dismissed the case. *Id*. at __.

On remand, the case was transferred to district court. The City amended its petition to clarify that it was also seeking to condemn the twenty-foot strip. The parties agreed to submit this issue to the trial court separately. The trial court found that the City had not properly condemned the twenty-foot strip. After a trial on the remaining issues, the jury found that: (1) the taking was not necessary to advance or achieve a public use; (2) the taking was for economic development purposes; and (3) the decision to take the property was fraudulent, in bad faith, and arbitrary and capricious as to the parking garage and the district plant. After post-verdict motions, the trial court concluded as a matter of law that: (1) the taking was necessary to advance or achieve a public use; and (2) that Government Code section 2206.001—the statute prohibiting takings for economic development—did not apply retroactively to the proceeding (disregarding the jury's contrary answers). However, the trial court entered judgment for the Whittingtons because it determined that legally and factually sufficient evidence supported the jury's findings that the taking was fraudulent,

9

in bad faith, and arbitrary and capricious. The trial court awarded the Whittingtons attorney's fees of $779,418.57.

On appeal, the court of appeals upheld the jury's finding that the City's taking as to the district plant was in bad faith because it determined that the City misrepresented the necessity of the district cooling plant to chill the air of nearby buildings, citing that District Plant 1 performed those tasks even after the plant was built on Block 38. __ S.W.3d __, __ (*Whittington III*). The court of appeals modified the Whittingtons' attorney's fee award to $674,418.57. *Id.*

The City filed a petition for review, which we granted. 54 Tex. Sup. Ct. J. 811 (Tex. Apr. 15, 2011). The City asserts that: (1) there is no exception to invalidate takings for public use, even if the takings were fraudulent, in bad faith, or arbitrary and capricious; (2) legally insufficient evidence supports the jury's findings that the taking was fraudulent, in bad faith, or arbitrary and capricious; (3) the City properly took the twenty-foot strip; and (4) the court of appeals opinion in *Whittington III* was defective because it only addressed the district cooling plant and not also the parking garage. Though they did not file a notice of appeal, the Whittingtons assert that (1) the City's taking violated Government Code section 2206.001 because it was for economic development purposes; and (2) the taking was not necessary for a public use.

### III. The Scope of Judicial Review

The parties first ask us to clarify the scope of judicial review. The City asserts that: (1) fraud, bad faith, and arbitrariness and capriciousness are simply means of proving that the City's stated use was actually private; and (2) this inquiry is one for the court, not the jury. We disagree with the first assertion because this Court has long recognized that fraud, bad faith, and arbitrariness and

capriciousness are exceptions that may invalidate takings, but we agree with the second assertion that this inquiry is generally a question of law for the Court.

We held in 1940 that the "question of what is a public use is a question for the determination of the courts; however, where the legislature has declared a certain thing to be for a public use, such declaration of the legislature must be given weight by the courts."[6] *Hous. Auth. of City of Dallas v. Higginbotham*, 143 S.W.2d 79, 83 (Tex. 1940). We explained that, "'[w]here the Legislature declares a particular use to be public use the presumption is in favor of this declaration, and will be binding upon the courts unless such use is clearly and palpably of a private character.'" *Id*. at 83 (quoting *West v. Whitehead*, 238 S.W. 976, 978 (Tex. Civ. App.—San Antonio 1922, writ ref'd)).

But the presumption favoring the legislative declarations that the property is being taken for public use and is necessary for that use does not abrogate judicial review. We held in *Higginbotham* that "[t]he law is well established in this state that where the power of eminent domain is granted, a determination by the condemn[or] of the necessity for acquiring certain property is conclusive in the absence of fraud." *Id*. at 88 (citing *West*, 238 S.W. at 978). Since *Higginbotham*, we have clarified that judicial review may nullify a taking where the condemnor's decision was fraudulent, in bad faith, or arbitrary and capricious. *See FKM P'ship Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 629 n.9 (Tex. 2008) ("'Once the presumption of necessity arises, the defendant can contest the fact of necessity only by establishing affirmative defenses such as fraud

---

[6] Our jurisprudence often refers to these takings as "legislative" ones because the Texas Legislature has delegated its condemnation authority to legislative bodies of local governments, which determine the public use and necessity and take the property. *See Burch v. City of San Antonio*, 518 S.W.2d 540, 542-43 (Tex. 1975).

11

(that, contrary to the ostensible public use, the taking would actually confer only a private benefit), bad faith, or arbitrariness.'" (quoting *Whittington I*, 174 S.W.3d at 898)).

In the absence of allegations that the condemnor's determinations of public use and necessity were fraudulent, in bad faith, or arbitrary and capricious, the legislative declaration that a specific taking is necessary for a public use is conclusive. *Coastal Indus. Water Auth. v. Celanese Corp. of Am.*, 592 S.W.2d 597, 600 (Tex. 1979) ("In the absence of allegations that the condemnor acted arbitrarily or unjustly, the legislature's declaration that a specific exercise of eminent domain is for public use is conclusive . . . ."); *see FKM P'ship*, 255 S.W.3d at 629–30. If such allegations are asserted, the trial court must inquire into whether the condemnor's determinations of public use or necessity were fraudulent, in bad faith, or arbitrary and capricious. *See FKM P'ship*, 255 S.W.3d at 630.

As the parties concede, this inquiry is an affirmative defense and the landowner bears the burden of proving his allegations as to this defense. *See id*. at 629 ("we have held that the agency's determination of public necessity is presumptively correct, absent *proof by the landowner* of the agency's fraud" (emphasis added)). The inquiry into whether the determinations of public use or necessity were fraudulent, in bad faith, or arbitrary and capricious is a question of law for the court. *See Maher v. Lasater*, 354 S.W.2d 923, 925 (Tex. 1962) ("the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts"); *Higginbotham*, 143 S.W.2d at 88 (approvingly noting that question of necessity was not submitted to the jury).[7] The trial

---

[7] In *Higginbotham*, we noted that courts and juries should not second guess the advisability of takings because takings for such projects as railway lines might result in the same taking being upheld in one county and invalidated in another. 143 S.W.2d at 89 ("The reason for the rule seems to be that: If different courts and juries were allowed to pass

12

court should only submit the issue to a jury if the underlying facts are in dispute. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006)*; Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex. 1997). If the court (or the jury when the underlying facts are in dispute) finds that the condemnor's determinations of public use or necessity were fraudulent, in bad faith, or arbitrary and capricious, the taking is invalid.

Here, the Whittingtons allege that the City's determinations of public use and necessity were fraudulent, in bad faith, and arbitrary and capricious. The trial court initially only ruled on whether the City took the twenty-foot strip and submitted the remaining issues to the jury.[8] However, the City and the Whittingtons do not dispute the underlying facts on these issues; rather, they dispute the legal effect of those facts (*e.g.*, whether those facts amount to fraud, bad faith, or arbitrariness and capriciousness). Because these issues are legal questions, we review them de novo. *See Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).[9]

## IV. The Parking Garage

on the necessity or advisability of condemning each tract out of the many which go to make up a right of way for a railway line, straight courses from point to point, with the consequent lessening of mileage, would in many, if not all, cases be impossible to secure. So in the case of depot grounds. One jury might hold, on competent evidence, that the land in question was not necessary to the purposes of the railroad. Another might render a like verdict as to any other tract sought to be subjected to its uses, and by such a course the company could be excluded altogether." (quotation marks omitted)). That rationale likewise necessitates that, although fraud, bad faith, and arbitrariness and capriciousness are the subject of judicial cognizance, their uniform application necessitates that they are questions of law for the court.

[8] The trial court ruled as a matter of law after the verdict that the taking was necessary for a public use and that Government Code section 2206.001 (prohibiting takings for economic development purposes) did not retroactively apply to this taking.

[9] The Whittingtons assert that the City waived the argument that fraud, bad faith, and arbitrariness and capriciousness are questions of law for the court. The City properly objected to these questions in its Motion to Bifurcate and its Motion to Disregard the Jury Verdict and Motion for Judgment Notwithstanding the Verdict. *See Hoffman-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 450 (Tex. 2004) (pure legal questions may be raised in post-verdict motions).

The City took possession of Block 38 for two distinct public purposes (the parking garage and the district plant).  We analyze each separately.

## A. Fraud

We first examine whether City's determination that the parking garage was necessary for a public use was fraudulent.  The parties' agreed to define fraud as "the taking of property for private use under the guise of public use, even though there may be no fraudulent intent on the part of the condemnor."[10] *See Higginbotham*, 143 S.W.2d at 83 ("'Where the Legislature declares a particular use to be public use the presumption is in favor of this declaration, and will be binding upon the courts unless such use is clearly and palpably of a private character.'" (quoting *West*, 238 S.W. at 978)); *see also Whitfield v. Klein Indep. Sch. Dist.*, 463 S.W.2d 232, 235 (Tex. Civ. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.) (holding proof of fraud in taking does not require proof of fraudulent intent).

### 1. Fraud in the Public Use of the Parking Garage

The parties agreed to define public use as:

a use which the public is entitled to share indiscriminately in as a matter of right.  A use is public when the public obtains some definite right or use in the undertaking to which the property is devoted.  What is important in the public-use determination is the character of the right inuring to the public, not the extent to which the public's right is exercised.

---

[10] The City objected and proposed an alternate definition of fraud, but has not pursued that issue on appeal.  As our inquiry is a question of law, these definitions in the jury charge should instead have been conclusions of law.  We may review conclusions of law to determine their correctness.  *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).  But we will not reverse an erroneous conclusion if the trial court rendered the proper judgment. *Id*.  Because any change in the definition would not yield a different outcome here, we do not address whether the parties' definition of fraud is legally correct in its entirety.

A "public use" is not a private use. A taking may not be used to confer a private benefit on a particular private party or parties through the use of the property. A taking may not be used for a public use that is merely a pretext to confer a private benefit on a particular private party or parties.

This Court has defined public use in similar circumstances as when the public obtains some definite right or use in the undertaking to which the property is devoted. *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 833 (Tex. 1958); *see also Higginbotham*, 143 S.W.2d at 84 ("'It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it.'"(quoting *West,* 238 S.W. at 978)). Public use, however, does not include a benefit to the public welfare or good under which any business that promotes the community's comfort or prosperity might be benefitted from the taking.[11] *Pate*, 309 S.W.2d at 833.

In 2001, the City Council authorized a condemnation lawsuit "for the construction of a parking garage for the Austin Convention Center . . . ." The Whittingtons assert that the taking was fraudulent as to the parking garage because it "favored one private party over another at public expense" by "reliev[ing] H.L. Hotels of its obligation to provide parking for the Convention Center."

We disagree. The parking garage was to provide parking for the expanded convention center. This is a public use. *Pate*, 309 S.W.2d at 833.[12] The effect of the City's decision to take Block 38

---

[11] In 2003, the Legislature added section 21.023 to the Property Code, which requires a governmental entity acquiring property through eminent domain to notify landowners of their right to repurchase the property if the public use for which the property was acquired is cancelled before the tenth anniversary of the acquisition. TEX. PROP. CODE § 21.023.

[12] *See* TEX. LOC. GOV'T CODE § 251.001(a)(1) (authorizing home rule municipalities to "exercise the right of eminent domain for a public purpose" such as providing, enlarging, or improving auditoriums); *id*. at § 251.001(a)(5) (authorizing home rule municipalities to "exercise the right of eminent domain for a public purpose," including "for any other municipal purpose the governing body considers advisable").

rather than build the larger underground garage with the hotel project was, at best, an incidental benefit to the H.L. Hotels.[13] The decision not to build the larger underground garage resulted in a cost savings to the hotel project of approximately $10–12 million, resulting in fewer bonds being issued. The direct impact to the project developer was that its fee would be reduced if the overall project cost was reduced. There was no evidence introduced at trial to prove a benefit to H.L. Hotels due to the lower cost of the project. We hold that the City's determination that the parking garage was a public use was not fraudulent.

## 2. Response to the Dissent

The dissent argues that the developer benefitted from the taking because, even though the project budget was reduced by $10–12 million, the developer took third-tier bonds in lieu of its 4.5% fee. __ S.W.3d __, __ (Hecht, J., dissenting). The dissent reasons that only a short time elapsed between the decision to negotiate exclusively with the developer and the decision to not build the underground garage and that the bonds in lieu of the fee were not adjusted when the plans changed. *Id*. But this assertion is devoid of any record support. The only testimony the dissent cites is from the convention center director stating that the developer took bonds in lieu of its fee. *Id*. at __, n.15. But the director never testified that the amount of bonds was not reduced after the parking garage plans were altered.[14] Nor did the Whittingtons put on any evidence proving that it was. The director

---

[13] There is no evidence in the record of a benefit to H.L. Hotels, and there is evidence to suggest it received a diminished fee as a result of the project costing less. *See supra* note 2.

[14] The convention center director testified:

"Q.     How much did [the developer] make out of this project in fees?

"A.     I'm not sure exactly how much they made at the end. There was—they took—in lieu of fees, they took

16

merely testified as to an approximate amount of bonds the developer ultimately received. Second, even if the amount of bonds in lieu of fees had been reduced—and there is no evidence it had—the dissent assumes the developer received a benefit without corresponding work performed with respect to the garage. The developer's fee compensates it for such costs as the design of the structure and the permitting process. The developer performed sufficient design work on the garage to determine what variances were needed. The developer then applied for those variances but they were not granted. In short, there is no evidence, much less proof, that the developer received the same fee when the plans for the garage were altered, and even if it had, there is evidence that the developer performed work associated with the fee. In sum, the record plainly refutes the dissent's assertion that the Whittingtons proved the developer benefitted from the decision to not build the garage.

### 3. Fraud in the Necessity of the Parking Garage

We next address whether the City's determination concerning the necessity of the parking garage was fraudulent. The Whittingtons assert that the determination of necessity for the garage was fraudulent because the City could cancel the 500 leases in its existing garage and therefore would not need to build a garage on Block 38.

We disagree that the City did not actually consider the garage necessary for parking for the convention center. The jury charge did not define "necessary." The statutory constraint on the City's

---

some third-tier bonds.

                  \*      \*      \*

"Q.      . . . [D]id you say that they got $10 million worth of bonds for their development fees?

"A.      That was—yeah, that was in lieu of fees. They got the third-tier bonds."

right to take here is that the City must "consider[] it necessary." TEX. LOC. GOV'T CODE § 251.001(a). When there are allegations of fraud with regard to the necessity of a taking such as this, the question is whether the condemnor actually considered the taking necessary for the public use—not whether the court believes the taking was actually necessary. *See Higginbotham*, 143 S.W.2d at 83. "The city council is the authority to exercise the power of eminent domain and must itself officially express the intention and necessity to condemn the land in question." *Burch v. City of San Antonio*, 518 S.W.2d 540, 545 (Tex. 1975). We look to official materials such as orders, resolutions, and minutes to examine the City's determinations of public use and necessity. *See Horton v. Mills Cnty.*, 468 S.W.2d 876, 878 (Tex. Civ. App.—Austin 1971, no writ.).

The City Council declared that public necessity required taking Block 38 for the parking garage. The evidence confirms that the City's determination of necessity was not fraudulent. Testimony from the director of the convention center department indicated that the existing garage and especially its elevator were too far from the new north entrance to the convention center to serve the expansion. That belief led the City staff to recommend the taking to the City Council because they believed it was necessary to accommodate parking requirements for the expanded convention center. We hold that the City's determination that the taking was necessary for a public use was not fraudulent.

**B. Bad Faith**

18

Our second inquiry on the parking garage is whether the City's determination that the parking garage was necessary for a public use was in bad faith. The parties agreed to define bad faith as "more than negligence or lack of diligence. Bad faith implies an intent to injure, or some other improper motive. Mere bad judgment does not qualify as bad faith. Rather, the Whittingtons must show that the City knowingly disregarded their rights."[15]

**1. Bad Faith in the Public Use of the Parking Garage**

The Whittingtons assert that the taking was in bad faith as to the parking garage because it relieved H.L. Hotels of an obligation to provide parking for the expanded convention center. We disagree. As previously addressed, the City's decision to take Block 38 rather than build the larger underground garage with the hotel project was, at best, an incidental benefit to H.L. Hotels—especially in light of the percentage fee it received as the project developer combined with the lower project cost of building a smaller garage. *See supra* Part IV.A.1. The evidence indicates that this decision was made because $10-12 million in hotel project costs needed to be cut to obtain favorable financing, and the additional construction difficulties of not obtaining variances and encountering water in the excavation made the garage a prime candidate for the cost savings to the hotel project. The City instead pursued the acquisition of Block 38, which was cater-cornered to the new north entrance to the convention center and was being leased to the City for convention center parking at the time. This does not prove that the City "knowingly disregarded [the Whittingtons']

---

[15] We express no opinion as to the complete accuracy of this definition but note that any variation would not affect our holding. *See supra* note 10.

19

rights" or had some intent to injure the Whittingtons. We hold that the City's determination that the parking garage was for a public use was not made in bad faith.

## 2. Bad Faith in the Necessity of the Parking Garage

We next address whether the City's determination of necessity for the parking garage was made in bad faith. The Whittingtons assert that the determination of necessity as to the garage was made in bad faith because the City could cancel the 500 leases in its existing garage, thereby removing the need to build a garage on Block 38.

We disagree. The City Council declared that public necessity required taking Block 38 for the parking garage. The evidence confirms that the City's determination of necessity was not in bad faith (defined here as an intent to injure the Whittingtons or some other improper motive). Rather, testimony indicated that the City was concerned with locating the parking garage close to the new north entrance of the convention center—which could not feasibly be done in conjunction with the hotel project due to construction and financing issues. We hold that the City's determination that the taking was necessary for the parking garage was not in bad faith.

## C. Arbitrary and Capricious

Our third inquiry is whether the City's determination that the parking garage was necessary for a public use was arbitrary and capricious. The parties agreed to define arbitrary and capricious as:

> a decision not done according to reason or judgment and is a willful and unreasoning action, action without consideration and in disregard of the facts and circumstances that existed at the time the condemnation was decided upon. When there is room for two opinions, an action cannot be deemed arbitrary when it is exercised honestly and upon due consideration, regardless of how strongly one believes an erroneous

20

> conclusion was reached. A showing that alternate plans are feasible or better does not make the condemnation determination arbitrary or capricious.

*See Ludewig v. Houston Pipeline Co.*, 773 S.W.2d 610, 614 (Tex. App.—Corpus Christi 1989, writ denied); *Wagoner v. City of Arlington*, 345 S.W.2d 759, 763 (Tex. Civ. App.—Fort Worth 1961, writ ref'd n.r.e.).[16]

The Whittingtons assert that the City's determination of the necessity for the parking garage was arbitrary and capricious because the City (1) failed to consider reasonable alternatives to condemning Block 38; and (2) abdicated its decision on the need to condemn Block 38 to H.L. Hotels.

### 1. Consideration of Alternatives

The Whittingtons rely on *Houston Lighting and Power Co. v. Klein Independent School District* to support their assertion that failure to consider alternatives is arbitrary and capricious. 739 S.W.2d 508 (Tex. App.—Houston [14th Dist.] 1987, writ denied). In *Houston Lighting and Power*, a utility sought to condemn school district property for a high-voltage power line. *Id.* at 511. The school argued that the decision was arbitrary and capricious because of the potential health risks to the students resulting from the power line's magnetic fields. *Id.* The court of appeals held that the jury could have found that the utility failed to take these concerns into consideration, which could be an action "not done according to reason or judgment." *Id.* at 518. The Whittingtons assert that the City Council "wholly failed to consider any alternatives in deciding to condemn," and acted arbitrarily and capriciously just as the condemnor in *Houston Lighting and Power* did.

---

[16] We express no opinion as to the legal accuracy of this definition but note that any variation would not affect our holding. *See supra* note 10.

We disagree. The City Council was considering Block 38 as the alternative parking solution for the hotel project. Testimony indicated that the City was concerned with locating the parking garage close to the new north entrance of the convention center—which could not feasibly be done in conjunction with the hotel project due to construction and financing issues. The record also indicates that City staff considered an additional site for a parking garage as well as cancelling the 500 leases in the existing garage near the west side of the convention center.

The definition of arbitrariness and capriciousness here does not require the chosen course to be more feasible or better than the alternative. Rather, it forbids decisions not made according to reason or judgment. The decision here that a parking garage close to the new convention center entrance that would not adversely affect the financing for the hotel project was made according to reason and judgment. Moreover, the rationale of *Houston Lighting and Power* does not apply to these facts because the City did, in fact, consider alternatives for the parking garage, such as building the garage as part of the hotel project, cancelling the leases in the other garage, or building a garage on an alternate site. We hold that the City's determination that the parking garage was necessary for a public use was not arbitrary and capricious due to a failure to consider alternatives.

### 2. Abdicating the Decision to Condemn

The Whittingtons also rely on *Malcomson Road Utility District v. Newsom* for their assertion that a condemnor acts arbitrarily and capriciously by abdicating its decision on the need to condemn to a private developer. 171 S.W.3d 257 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). In *Malcomson*, the condemnor did not conduct due diligence on where to locate a detention pond but instead followed the recommendation of a developer to locate the pond on another owner's property

22

nearby. *Id*. at 272–73. The developer agreed to pay the costs of the condemnation in the event it did not succeed. *Id*. at 273–74. The court of appeals held that a fact issue existed as to whether the District declined to exercise its discretion in determining what land to condemn. *Id*. at 273. The Whittingtons assert that the City abdicated the decision of the need to condemn to H.L. Hotels here, which amounts to arbitrariness and capriciousness.

We disagree. We need not decide here whether a condemnor acts arbitrarily and capriciously by abdicating the condemnation decision to a developer. Here, the City did not abdicate the decision to condemn Block 38 to H.L. Hotels. When financing and construction issues for building a larger underground garage with the hotel project began to surface, the City began negotiating with the Whittingtons to acquire Block 38. There is evidence that the City staff had a brief conversation with the developer, and the developer made several phone calls to Harry Whittington in the fall of 1999 to discuss parking—after City staff had already begun negotiating with the Whittingtons. However, there is no evidence that the developer made the decision to acquire Block 38 or funded the condemnation of Block 38 as the developer in *Newsom* did. 171 S.W.3d at 273–74. Rather, the City undertook the due diligence and did not rely on the developer to determine the new location of the garage or fund the condemnation. Because the City did consider alternatives and did not abdicate the determinations to a private developer, its determination that Block 38 was necessary for a parking garage was not arbitrary and capricious.

23

## V. The District Plant

The City also took possession of Block 38 to build District Plant 2 for use with its chilled water program. We assess separately the City's determinations of public use and necessity as to the district plant.

## A. Fraud

We must first decide whether the City's determination that the district plant was necessary for a public use was fraudulent. The parties agreed to define fraud as "the taking of property for private use under the guise of public use, even though there may be no fraudulent intent on the part of the condemnor."[17]

### 1. Fraud in the Public Use of the District Plant

In 2001, the City Council authorized a condemnation lawsuit "for the construction of . . . a district cooling plant for Austin Energy . . . ." The Whittingtons assert that the taking was fraudulent because district cooling is not a public use.

We disagree. We have defined public use in similar circumstances as when the public obtains some definite right or use in the undertaking to which the property is devoted. *Pate*, 309 S.W.2d at 833. "'It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it.'" *Higginbotham*, 143 S.W.2d at 84 (quoting *West*, 238 S.W. at 978). Public use, however, does not include a benefit to the public welfare or good under which

---

[17] *See supra* note 10.

any business that promotes the community's comfort or prosperity might be benefitted from the taking. *Pate*, 309 S.W.2d at 833.

A home rule municipality that provides electric service is serving a public use.[18] While the Local Government Code does not expressly authorize takings for district cooling, it does authorize takings "as necessary to efficiently carry out" its purposes of providing public utilities and "for any other municipal purpose the governing body considers advisable." TEX. LOC. GOV'T CODE §§ 251.001(a)(5), 552.002(b). The City considered district cooling as a method of efficiently assisting the electric utility by shifting demand from peak to off-peak times, thereby avoiding having to build more power plants. Moreover, the chilled water service is available to any customer that applies, though pricing for the service is determined by the cost of connecting the customer to the chilled water loop. While district cooling may be limited in its geographic scope, it is available to all who apply and agree on pricing with the City. We hold that the district plant here was serving a public use. *See Pate*, 308 S.W.2d at 833; *Higginbotham*, 143 S.W.2d at 84.

## 2. Fraud in the Necessity of the District Plant

The Whittingtons assert that the City's determination of necessity for District Plant 2 was fraudulent because the City misrepresented to the Whittingtons that it was necessary to serve the convention center expansion and the hotel project. The City's final offer letter to the Whittingtons stated the "plant will be used to provide chilled water necessary to operate the air conditioning systems of the Convention Center expansion and" the hotel project. As evidence of fraud, the

---

[18] *See* TEX. LOC. GOV'T CODE § 251.001(a)(1) (authorizing home rule municipalities to "exercise the right of eminent domain for a public purpose" such as providing, enlarging, or improving electric power systems).

Whittingtons point to an email from the project manager for District Plant 2 to the author of the final offer letter stating: "to be completely clear, someone's pointed out that actually those buildings are currently going to be served from [District Plant 1] until the new plant is built . . . . So this new plant is not *absolutely* necessary for operation of the buildings mentioned but a redundancy is much better." (emphasis added). District Plant 1 still provided service to the convention center expansion and the hotel project for some time even after District Plant 2 became operational due to a decrease in customer demand as a result of economic market conditions.

The project manager's statement is not evidence of fraud for multiple reasons. First, the statement that the district plant was not absolutely necessary was in a class of communications not ordinarily relevant to the inquiry of whether the City Council's determination of necessity was fraudulent, in bad faith, or arbitrary and capricious. To assess the City's determinations, we look to official materials such as orders, resolutions, and minutes. *See Horton*, 468 S.W.2d at 878. Our purpose in restricting our review to these materials is that the words of one city council member or city employee do not ordinarily bind the entire city council. *See, e.g.*, *AT&T Commc'ns of Tex., LP v. Sw. Bell Tel. Co.,* 186 S.W.3d 517, 528-29 (Tex. 2006) ("But the statement of a single legislator, even the author and sponsor of the legislation, does not determine legislative intent"). Therefore, emails by City employees are not among the items we ordinarily consider in undertaking this review.

Here, the Whittingtons argue that the City Council ratified the acts of its employees, adopting the email as its own. Specifically, the City's 2006 resolution stated that the

> public necessity to acquire Block 38 in its entirety . . . is hereby confirmed and ratified . . . and all acts done or initiated by employees, attorneys or representatives of the City to acquire or condemn Block 38 in its entirety . . . are hereby authorized,

ratified, approved, confirmed and validated and declared to be valid in all respects and purposes as of the respective dates thereof for the public necessity and for the public use as a City parking garage, a chilling plant, and other municipal facilities.

Assuming without deciding that the ratification elevated the email to have the force of a City Council resolution, we disagree that it demonstrates that the City's determination of necessity was fraudulent. As an initial matter, this argument equates "necessary" with "absolutely necessary." The Local Government Code only requires that the condemnor consider the taking necessary for the public use. TEX. LOC. GOV'T CODE § 251.001(a). The email the Whittingtons rely on states that the district plant was not "*absolutely* necessary" for the operation of the convention center expansion and the hotel project. *See United States v. Comstock*, 130 S.Ct. 1949, 1956 (2010) (differentiating "necessary" and "absolutely necessary" under the federal constitution's Necessary and Proper Clause). Moreover, even had the email stated that the district plant was not necessary, the City Council expressed a clear belief in its 2006 resolution that the district plant was necessary. This determination of necessity was one of the two purposes the resolution accomplished (the other being the inclusion of a twenty-foot strip in the taking, addressed *infra* at Part VI). We interpret statutes and ordinances to avoid absurd results. *Carreras v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011). The Whittingtons invite us to interpret the resolution in a way that negates one of its two purposes. We decline to do so.

The evidence instead indicates that District Plant 2 was necessary to perform district cooling in the future. Consumer demand for the program increased over time, and the City needed additional capacity to meet not only the demand but also its contractual obligations. In addition, District Plant 2 was needed as a backup in the event that District Plant 1 required down time. This evidence

27

confirms that the City determined District Plant 2 to be necessary—even if we were to assume the City did not believe it was *absolutely* necessary.

## B. Bad Faith

Our second inquiry on the district plant is whether the City determined in bad faith that the plant was necessary. The charge defines bad faith as "more than negligence or lack of diligence. Bad faith implies an intent to injure, or some other improper motive. Mere bad judgment does not qualify as bad faith. Rather, the Whittingtons must show that the City knowingly disregarded their rights."[19] The Whittingtons argue that the City's decision to take Block 38 was made in bad faith because the City misrepresented to the Whittingtons that the district plant was necessary to serve the convention center expansion and the hotel project.

We disagree. As previously addressed, the evidence confirmed the City's representation to the Whittingtons that the district plant was necessary to serve the convention center expansion and the hotel project due to future demand and the need for a backup for the existing district plant. *See supra* Part V.A.2. Likewise, we hold that the City's determination that the district plant was necessary was not made in bad faith as it did not evidence an intent to injure the Whittingtons or a knowing disregard of their rights.

## C. Arbitrary and Capricious

Our third inquiry as to the district plant is whether the City's determination that the plant was necessary was arbitrary and capricious. The charge defined arbitrary and capricious as:

---

[19] *See supra* note 10.

a decision not done according to reason or judgment and is a willful and unreasoning action, action without consideration and in disregard of the facts and circumstances that existed at the time the condemnation was decided upon. When there is room for two opinions, an action cannot be deemed arbitrary when it is exercised honestly and upon due consideration, regardless of how strongly one believes an erroneous conclusion was reached. A showing that alternate plans are feasible or better does not make the condemnation determination arbitrary or capricious.[20]

The Whittingtons assert that the City's determination of the necessity for the district plant was arbitrary and capricious because the City Council failed to consider reasonable alternatives to condemning Block 38 for the district plant.

We disagree. The evidence indicates that City staff investigated multiple alternative locations for the district plant and that the City Council determined the plant was necessary. *See supra* note 2. Because only the City Council has the power to condemn for the City, only it may make the determinations of public use and necessity. *Burch*, 518 S.W.2d at 543-45. But this does not mean that investigation of alternatives must be conducted exclusively by the City Council rather than by City staff. The Whittingtons cite no authority for this proposition, and we are not aware of any.[21] We hold that the City's determination that the district plant was necessary was not arbitrary and capricious.

---

[20] *See supra* note 10.

[21] Neither *Newsom* nor *Houston Power and Lighting*, on which the Whittingtons rely, indicate that a condemnor's governing body cannot delegate some due diligence to the condemnor's staff. *Newsom* involved a condemnor delegating all due diligence to a private developer that was interested in the condemnation decision. 171 S.W.3d at 272–73. Here, City staff investigated the alternative locations for District Plant 2. In *Houston Lighting and Power*, the condemnor ignored a potential health risk to students of taking school property for a high-voltage power line. 739 S.W.2d at 517-18. The failure by the condemnor to consider a risk is not at issue here.

29

## VI. The Twenty-Foot Strip

Also at issue in this appeal is whether the City took the twenty-foot strip of land bisecting Block 38. The City's original plan in 1830 created Block 38, which indicated there was a twenty-foot wide alley. In 1929, the Legislature relinquished fee title to the center of the alleys in the City to owners of the abutting land.[22] Act of July 17, 1929, S.B. 18, 41st Leg., 3d C.S., § 1, 1929 Tex. Gen. Laws 239. The language in the deeds with which the Whittingtons acquired Block 38 referred to: "Block Thirty-eight . . . being all of Lots One through Eight (1–8), inclusive, in said Block, and all alleys and easements heretofore existing, none of such alleys having been opened and all such alleys and easements having been relinquished by the City of Austin, Texas." Subsequent deeds among the Whittingtons described the property as: "All of Block Thirty-eight (38), being Lots One (1) through Eight (8)." The City's 2001 condemnation resolution described the property to be taken as "Lots 1–8, inclusive, Block 38." The City passed a resolution in 2006 stating that public use and necessity had required the taking of Block 38 (including the strip) in 2001 and that if a court determined the City did not take the strip, City staff were authorized to negotiate to acquire it and file a condemnation suit if negotiations were not successful. The City then amended its condemnation pleading to include the twenty-foot strip.

The issue was tried to the court by agreement of the parties. The trial court found that Harry Whittington acquired all of Block 38 (including the twenty-foot strip) in 1981, and concluded that:

---

[22] The law provided: "there shall be and is hereby relinquished to each owner of land abutting streets, alleys or highways in the City of Austin, Texas, the fee title to the center of the street, alley or highway upon which the particular land abuts, and for the distance along such street, alley or highway that the land abuts." Act of July 17, 1929, S.B. 18, 41st Leg., 3d C.S., § 1, 1929 Tex. Gen. Laws 239. The law preserved any then-existing easements. *Id*. at § 2.

30

(1) the City's 2001 condemnation resolution description of "Lots 1–8, inclusive, Block 38" did not encompass the twenty-foot strip; and (2) there is no easement on the strip. The City challenges these last two conclusions. We review conclusions of law de novo. *BMC Software Belgium, NV v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

## A. The 2001 Resolution

The City argues that the 1929 relinquishment law means the Whittingtons took title to the strip when they acquired Block 38 and the City's reference to "Lots 1–8, inclusive, Block 38" in the 2001 resolution included the strip. The Whittingtons argue that the 1929 relinquishment law vested title in alleys to landowners at the time but did not change the legal description of the alleys.

We agree with the Whittingtons that the 2001 resolution did not include the strip. The 1929 relinquishment law granted fee simple title in the strip to the adjoining landowners. Act of July 17, 1929, S.B. 18, 41st Leg., 3d C.S., § 1, 1929 Tex. Gen. Laws 239. However, the strip was then a separate parcel of land. As the trial court found, Harry Whittington acquired this strip in 1981 in a deed referring to "Block Thirty-eight . . . being all of Lots One through Eight (1–8), inclusive, in said Block, *and all alleys* and easements heretofore existing, none of such alleys having been opened and all such alleys and easements having been relinquished by the City of Austin, Texas." (emphasis added). The use of "and" in the 1981 deed indicates that "Lots 1–8, inclusive" does not encompass the strip. The City's 2001 condemnation resolution only referred to "Lots 1–8, inclusive, Block 38" and did not include the twenty-foot strip.

The City points to a line of cases indicating that alleys are presumed to be covered by descriptions of adjoining lots. *See Cox v. Campbell*, 143 S.W.2d 361, 362–64 (Tex. 1940);

31

*Amerman v. Missouri, K. & T. Ry. Co. of Tex.*, 182 S.W. 54, 57 (Tex. Civ. App.—Galveston 1915, writ ref'd). However, these cases refer to alleys that involve easements. *See Angelo v. Biscamp*, 441 S.W.2d 524, 526 (Tex. 1969). When an easement is abandoned, the landowner is vested with unencumbered fee simple title, and the presumption of an intent to convey the easement no longer applies. *Id*. The 1929 relinquishment law vested fee simple title to the strip in the owners of Lots 1–8 at that time. The presumption that conveying the lots also conveyed the alley no longer applied.[23] *See Angelo*, 441 S.W.2d at 526. Accordingly, the 2001 resolution did not include the strip.

**B. The 2006 Resolution**

The question then is whether the 2006 resolution and pleading amendment include the twenty-foot strip and are permissible. The City asserts that the 2006 resolution and pleading amendment cured any defect and took the strip. The Whittingtons respond that the trial court lacked jurisdiction to add the strip to the condemnation proceeding because it would prejudice them.[24]

We agree with the City. The language of the 2006 resolution clearly indicated the City's belief that, as of 2001, public use and necessity required condemning all of Block 38, including the strip: "The public necessity to acquire Block 38 in its entirety, including, but not limited to, the

---

[23] This Court has long recognized a presumption that narrow strips of land that are small in size and value compared to the adjoining tract are conveyed with the larger, adjoining tract—a policy known as the "strip and gore doctrine." *Angelo*, 441 S.W.2d at 526–27. The City does not assert that doctrine here.

[24] The Whittingtons also assert that the City Council only authorized taking the strip if the current proceeding finds the City did not take the strip. We disagree. The 2006 resolution indicated the City believed in 2001 that all of Block 38, the strip included, was necessary for public use. While the 2006 resolution did authorize separate negotiations and a condemnation proceeding if this proceeding determined the City did not take the strip, the resolution did not prohibit its use in this proceeding.

[strip], for the public purpose of a City parking garage, a chilling plant, and other municipal facilities is hereby confirmed and ratified as of the effective date of [the 2001 resolution]."

The next inquiry is whether the 2006 resolution and pleading amendment were permissible. We have held that taking less land than a resolution specified is within a court's subject matter jurisdiction if it does not prejudice the landowner. *FKM P'ship,* 255 S.W.3d at 626. We have also held that taking additional land is within a court's jurisdiction if the parties so stipulate because the stipulation indicates no material prejudice to the landowner. *State v. Nelson*, 334 S.W.2d 788, 791–92 (Tex. 1960). In *FKM Partnership*, we left open the question of whether a trial court has jurisdiction when the condemnor amends its pleadings to take additional land after the commissioner's hearing. 255 S.W.3d at 626 n.3.

As the parties indicate, the inquiry here is whether the Whittingtons were prejudiced by the pleading amendment that included the strip. The Whittingtons' expert testified that the strip had no independent value if the City took Lots 1–8. The jury agreed, finding the same value for Block 38 with or without the strip. Further, there is no indication that the Whittingtons were unprepared to litigate the issue and were denied a continuance. Therefore, we hold that the inclusion of the twenty-foot strip in the trial court proceedings did not prejudice the Whittingtons, and the City's 2006 resolution properly took the twenty-foot strip.

**VII. Economic Development**

The Whittingtons raise two other arguments supporting their request that we should nonetheless affirm the court of appeals conclusion that the taking is invalid: (1) section 2206.001 of the Government Code invalidates the taking; and (2) the taking was not necessary for a public use.

33

## A. Preservation

We must first determine whether the Whittingtons may raise such points of error as they did not file a notice of appeal. Texas Rule of Appellate Procedure 25.1 requires that "[a] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal." TEX. R. APP. P. 25.1(c). The rule further provides that "[t]he appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." *Id*.

The Whittingtons argue that a litigant is only attacking a judgment (and must only file a notice of appeal) if it seeks greater relief than awarded in the judgment. *See Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 574 n.11 (Tex. App.—Austin 2007, pet. denied) (allowing cross-point that did not seek greater relief); *Dean v. Lafayette Place (Section One) Council of Co-Owners, Inc.*, 999 S.W.2d 814, 818 (Tex. App.—Houston [1st Dist.] 1999, no pet.) ("The independent grounds for affirmance can be raised in a cross-point as long as the appellee is not requesting greater relief than that awarded by the trial court."). We agree. Here, the Whittingtons do not seek greater relief than the judgment provided. They only seek the same relief the judgment provided in the event that we rule for the City on its points of error. Accordingly, we address the Whittingtons' points of error.

## B. Whether Section 2206.001 Is Retroactive

The Whittingtons first point of error is that section 2206.001 of the Government Code invalidates the taking because it was for economic development purposes. Section 2206.001 states: "A governmental or private entity may not take private property through the use of eminent domain

34

if the taking . . . is for economic development purposes . . . ." TEX. GOV'T CODE § 2206.001(b)(3). The charge asked:

> Does the City of Austin seek to take the Whittingtons' property for economic development purposes?
>
> The City may not take private property if the taking is for economic development purposes.
>
> A condemnation for "economic development purposes" does not include a condemnation for a public building or the provision of utility services.[25]

The jury answered "yes" as to both the parking garage and the district plant. The trial court disregarded the answer, holding that section 2206.001 does not apply retroactively to this case.

We disagree that section 2206.001 is not retroactive, but we hold that the statutory exceptions apply. Section 2206.001 was added in 2005—after the City filed its condemnation proceeding in 2001. Act of Aug. 31, 2005, 79th Leg., 2d C.S., S.B. 7, Ch. 1, § 1, 2005 Tex. Gen. Laws 1. The Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16. We generally presume that statutes are prospective unless they are expressly made retroactive. TEX. GOV'T CODE § 311.022; *State v. Fidelity Deposit Co. of Md.*, 223 S.W.3d 309, 311–12 (Tex. 2007) per curiam). Section 2206.001 is not expressly retroactive. Act of Aug. 31, 2005, 79th Leg., 2d C.S., S.B. 7, Ch. 1, § 1, 2005 Tex. Gen. Laws 1. However, applying procedural, remedial, or jurisdictional statutes retroactively does not violate the Constitution's prohibition on retroactive laws. *Univ. of Tex. Sw.*

---

[25] *See* TEX. GOV'T CODE § 2206.001(c)(4)–(5). The City objected to the lack of a definition of economic development but does not raise that issue in this Court.

*Med. Ctr. v. Estate of Arancibia*, 324 S.W.3d 544, 548 (Tex. 2010). This is because procedural and remedial laws generally do not affect vested rights, which are property rights that the Constitution protects like any other property. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002). Such procedural and remedial laws that do not affect vested rights should be enforced as they exist at the time judgment is rendered. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 198 (Tex. 2007).

In this context, a condemnor only obtains a vested right in property it seeks to take once it obtains a judgment in its favor. TEX. PROP. CODE § 21.065 ("A judgment of a court under this chapter vests a right granted to a condemnor."); *see also Middleton v. Tex. Power & Light Co.*, 185 S.W. 556, 559 (Tex. 1916) (holding that a vested right is a property right). The City has yet to obtain a judgment in its favor on the taking of Block 38. Accordingly, we must apply section 2206.001 as it currently exists. *Tex. Mun. Power Agency*, 253 S.W.3d at 198.

### C. Whether Section 2206.001 Invalidates the Taking

The question then is whether section 2206.001 invalidates the City's taking. The jury found that the taking was for economic development purposes as to both the parking garage and district plant. The trial court's basis for disregarding this finding (that the law was not retroactive) was in error. *See supra* Part VII.B. We must uphold that finding unless the City conclusively proved that the taking was not for economic development purposes. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

The City asserts that the parking garage is a public building and the district plant is for the provision of utility services—both of which are statutory exceptions to section 2206.001's

36

prohibition on takings for economic development purposes that were incorporated into the charge.[26] TEX. GOV'T CODE § 2206.001(c)(4)–(5). The Government Code does not define the "public building" or "utility services," and because they have acquired technical or particular meanings, we construe them accordingly. TEX. GOV'T CODE § 311.011(b).

We conclude the evidence conclusively establishes that the parking garage is a public building. The garage is open to the public, but the primary purpose of the garage is to support the expanded convention center.[27] The City owns the garage and receives the income from those who park in the garage. Providing, enlarging, or improving auditoriums are public uses under the Local Government Code, and land may be condemned by a municipality if considered necessary for those public uses. TEX. LOC. GOV'T CODE § 251.001(a)(1). We have concluded that the parking garage serving the expanded convention center in this situation is a public use. *See supra* Part IV.A.1. It follows that the garage, which is owned by the City and for a public use, is a public building.

Moreover, the evidence conclusively establishes that the district plant is for the provision of utility services. The parties do not dispute that electricity is a utility service. The Whittingtons assert that district cooling provides chilled water, not electricity, and is not a utility because it is not regulated.

We disagree. There are two factors that indicate the district plant is assisting the municipal electric utility. First, district cooling shifts demand from peak to off-peak times, thereby avoiding

---

[26] The City has not asserted, and we do not decide, whether the district plant is also a public building.

[27] *See Higginbotham*, 143 S.W. 2d at 84("'It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it.'"(quoting *West,* 238 S.W. at 978)).

the need to build more power plants. Second, the district plant still uses municipal electricity to cool subscribing buildings by freezing water at night and circulating chilled water during the day. Without district cooling, those customers would be consuming municipal electricity during the daytime as there are no other providers of district cooling in the area. We determined that the district plant here serves a public use by assisting the electric utility. *See supra* Part V.A.1; *see* TEX. LOC. GOV'T CODE § 552.002(b)(authorizing takings "as necessary to efficiently carry out" the purposes of providing public utilities). It follows that the district plant is providing utility services by assisting the City's electric utility. Because the City conclusively established that the parking garage and district plant fell within statutory exceptions to section 2206.001 of the Government Code, that section does not invalidate the City's taking.

## VIII. Necessity for Public Use

The Whittingtons' second point of error is that the taking was not necessary for a public use and is thus invalid. The charge asked: "Is the taking of the Whittingtons' property necessary to advance or achieve a public use?" The jury answered "no" as to both the parking garage and the district plant. The trial court disregarded the jury's answer, holding that the taking was necessary to advance or achieve a public use as a matter of law.

We must note that the proper inquiry for a court is to determine whether the condemnor's determinations of public use and necessity were fraudulent, in bad faith, or arbitrary and capricious (if the landowner so alleges). *See supra* Part III. As part of this inquiry, we have held that the parking garage and district plant serve public uses. *See supra* Parts IV.A.1, V.A.1. Further, we have held that the City's determinations of necessity as to the parking garage and district plant were not

fraudulent, in bad faith, or arbitrary and capricious. *See supra* Parts IV.A.2, IV.B.2, IV.C, V.A.2, V.B, and V.C. This ends the judicial inquiry into the legislative determinations of public use and necessity. *See supra* Part III. We overrule the Whittingtons second point of error.

## IX. Conclusion

We hold that the City's determination that Block 38 was necessary for public use was not fraudulent, in bad faith, or arbitrary and capricious. We further hold that City's taking included the twenty-foot wide strip of land bisecting Block 38, and its inclusion in the underlying proceeding did not prejudice the Whittingtons. Moreover, we conclude that, although section 2206.001 of the Government Code is retroactive as applied here, it does not invalidate the City's taking because the purposes for the taking fall within statutory exceptions to section 2206.001. Because we have affirmed the City's right to take the land at issue, we reverse the judgment of the court of appeals and remand for entry of judgment in accordance with this opinion.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED: August 31, 2012**

39