# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0850

═══════════

KMS RETAIL ROWLETT, LP
F/K/A KMS RETAIL HUNTSVILLE, LP, PETITIONER,

v.

CITY OF ROWLETT, TEXAS, RESPONDENT

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════

JUSTICE BLACKLOCK, joined by JUSTICE LEHRMANN and JUSTICE BOYD, dissenting.

"The protection of property rights, central to the functioning of our society, should not—indeed, cannot—be charged to the same people who seek to take those rights away." *City of Dallas v. Stewart*, 361 S.W.3d 562, 580 (Tex. 2012). Yet that is exactly what happens when courts give "deference" to the government's self-serving declaration that its decision to condemn private property satisfies Article I, Section 17 of the Texas Constitution.

I concede that the majority's approach to Article I, Section 17—Texas's Takings Clause—is grounded in this Court's precedent, which does seem to dictate the unduly deferential and unnecessarily complicated legal standards the majority carefully applies. The problem is that these judicially crafted standards are not grounded in the current text of the Texas Constitution. The Court's submissive approach originated in cases that pre-date the 2009 amendment to the Texas Takings Clause. That amendment afforded property owners greater protection against eminent

domain in the wake of the United States Supreme Court's controversial decision in *Kelo v. City of New London*, 545 U.S. 469 (2005). The Texas Takings Clause as amended—not outdated judicial gloss interpreting superseded constitutional text—ought to provide the bedrock for arguments about the constitutionality of the government's attempt to take private property. Instead of deriving the governing legal standards from case law that pre-dates the 2009 amendment, the Court should seek to derive those standards from the current text of the Texas Constitution.

This Court began to move away from an unduly deferential approach in *City of Austin v. Whittington*, in which we stressed that the "question of what is a public use is a question for the determination of the courts." 384 S.W.3d 766, 777 (Tex. 2012) (quoting *Hous. Auth. of Dall. v. Higginbotham*, 143 S.W.2d 79, 83 (Tex. 1940)). Around the same time, we likewise stated that "[u]nadorned assertions of public use are constitutionally insufficient" in determining whether a use will "in fact be public rather than private." *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 195 (Tex. 2012). We should continue heading in the right direction.

Applying Article I, Section 17 as amended, I would require the government to affirmatively establish that its proposed taking satisfies every requirement the constitutional (or statutory) text imposes. Rather than hold the City to that burden—the same burden any other plaintiff must carry—the Court's precedent reverses the burden by assuming the constitutionality of the taking based on the City's say-so and then requiring the property owner to prove unconstitutionality. After shifting the burden of proof, the precedent oddly restricts the property owner to just three possible defenses—fraud, bad faith, and arbitrariness—all of them affirmative defenses property owners must prove. This limited menu of confusingly labelled defenses has very little to do with

2

the Constitution, certainly not in its post-2009 form. The Court should eliminate deference to the government in takings cases, undo its unjustified burden-shifting rule, and get rid of artificial restrictions on the defenses available to property owners. Rather than picking their way through a court-created procedural maze that has no basis in the text of the Constitution, the parties should be arguing about what the updated constitutional text means and whether the proposed taking complies with it. Jettisoning decades of case law may seem radical, but it ought to be expected when the Constitution itself—on which the case law is ostensibly based—changes. And it's exactly what Texans seem to have intended when they amended their Constitution in response to *Kelo*. We should honor that choice instead of clinging to outdated and confusing judicial constructs derived from a constitutional text the voters deemed inadequate to protect their rights. Because the majority does otherwise, I respectfully dissent.

\* \* \*

Since at least 1876, the Texas Constitution has protected private property against any government taking that is not for "public use."[1] Until 2009, the "public use" clause of Article I, Section 17 resembled the "public use" language of the federal Constitution's Takings Clause.[2] *See* U.S. CONST. amend. V. That is no longer the case. In 2009, Texans voted to amend their Constitution by placing further restrictions on the government's exercise of eminent domain. Article I, Section 17 now says:

---

[1] "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money . . . ." TEX. CONST. art. I, § 17 (amended 2009).

[2] *Compare* TEX. CONST. art. I, § 17 (amended 2009) ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ."), *with* U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

3

(a) No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person, and only if the taking, damage, or destruction is for:
    (1) the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by:
        (A) the State, a political subdivision of the State, or the public at large; or
        (B) an entity granted the power of eminent domain under law; or
    (2) the elimination of urban blight on a particular parcel of property.
(b) In this section, "public use" does not include the taking of property under Subsection (a) of this section for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues.

TEX. CONST. art. I, § 17 (a)–(b) (2009 additions underlined).

The impetus for the 2009 constitutional amendment was *Kelo v. City of New London*. S. Comm. on State Affairs, Bill Analysis, Tex. S.J.R. 42, 81st Leg., R.S. (2009) ("This constitutional amendment addresses *Kelo v. City of [New] London*, 545 U.S. 469 (2005)."). Understanding *Kelo* helps illuminate the amendment's language. In *Kelo*, a city took private property through eminent domain only to turn it over to other private parties for economic development. 545 U.S. at 473–75. In a five-to-four decision, the Supreme Court held that this taking did not violate the "public use" requirement of the Fifth Amendment's Takings Clause. *Id.* at 484. Central to the Supreme Court's reasoning was a line of precedent that "eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483. The Court also relied heavily on prior cases under which the Fifth Amendment's "public use" requirement had been interpreted to encompass any "public purpose," without regard to who would actually "use" the property. *See id.* at 479–82. Incorporating these two concepts, the majority in *Kelo* summarized its understanding of the constitutional standard: "The disposition of this case therefore turns on the question whether the City's development plan serves a 'public purpose.' Without exception, our cases have defined that concept broadly,

4

reflecting our longstanding policy of deference to legislative judgments in this field." *Id.* at 480.

This deferential formulation bears no small resemblance to our Court's statement in 1940 that "[w]here the Legislature declares a particular use to be public use the presumption is in favor of this declaration, and will be binding upon the courts unless such use is clearly and palpably of a private character." *Hous. Auth. of Dall.*, 143 S.W.2d at 83 (quoting *West v. Whitehead*, 238 S.W. 976, 978 (Tex. App.—San Antonio 1922, writ ref'd)).

Justices O'Connor and Thomas dissented in *Kelo*. Justice O'Connor criticized the majority's holding "that the sovereign may take private property currently put to ordinary private use, and give it over for new, ordinary private use, so long as the new use is predicted to generate some secondary benefit for the public." *Kelo*, 545 U.S. at 501 (O'Connor, J., dissenting). She would have construed the Court's existing precedent to prohibit such a taking. *Id.* at 498. Justice Thomas, on the other hand, advocated for abandonment of the precedent. *Id.* at 506 (Thomas, J., dissenting). He criticized the majority—and the precedent it relied on—for merging "public use" with "public purpose" and for deferring to legislative determinations of public use. *Id.* at 514–15. In his view, "[o]nce one permits takings for public purposes in addition to public uses, no coherent principle limits what could constitute a valid public use." *Id.* at 520. He interpreted the Fifth Amendment to authorize "takings for public use only if the government or the public *actually uses* the taken property." *Id.* at 514 (emphasis added). As for deference, Justice Thomas wrote that "a court owes no deference to a legislature's judgment concerning the quintessentially legal question of whether the government owns, or the public has a legal right to use, the taken property." *Id.* at 517. He continued:

> We would not defer to a legislature's determination of the various circumstances that establish, for example, when a search of a home would be reasonable, or when

> a convicted double-murderer may be shackled during a sentencing proceeding without on-the-record findings, or when state law creates a property interest protected by the Due Process Clause.
>
> Still worse, it is backwards to adopt a searching standard of constitutional review for nontraditional property interests, such as welfare benefits, while deferring to the legislature's determination as to what constitutes a public use when it exercises the power of eminent domain, and thereby invades individuals' traditional rights in real property.

*Id.* at 518 (citations omitted). Rather than the deferential approach dictated by the Court's precedent, he advocated for straightforward application of the Public Use Clause based on its text and history. Under such an approach, courts would determine de novo whether a taking satisfies the Public Use Clause by asking whether "the government owns, or the public has a legal right to use, the taken property." *Id.* at 517.

With the debate over *Kelo* as the backdrop, it becomes apparent that the 2009 amendments to the Texas Takings Clause flow directly from these two dissenting opinions. The new subsection (b) prohibits "taking of property . . . for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues." TEX. CONST. art. I, § 17(b). This provision directly rejects the *Kelo* majority's holding, essentially adopting into the Texas Constitution the rule Justice O'Connor would have employed. In this case, KMS does not allege that the City of Rowlett condemned its property "for transfer to a private entity." It does, however, allege that the taking fails the constitutional "public use" requirement. This implicates the changes to subsection (a), which states the "public use" requirement. Those changes incorporate into the Texas Constitution something very similar to Justice Thomas's understanding of public use, which looks to whether "the government or the public actually uses the taken property," *Kelo*, 545 U.S. at 514 (Thomas, J., dissenting), and "whether the government owns, or the public has a legal right

6

to use, the taken property." *Id.* at 517. Under this approach, "[t]he term 'public use,' then, means that either the government or its citizens as a whole must actually 'employ' the taken property." *Id.* at 508–09. The amended Texas Takings Clause now incorporates a similar standard. Under the 2009 amendment, governments in Texas may take property "only if the taking . . . is for . . . the ***ownership, use, and enjoyment*** of the property, notwithstanding an incidental use, by . . . the State, a political subdivision of the State, or the public at large . . . ." TEX. CONST. art. I, § 17(a) (emphasis added).

Prior to the changes to subsection (a), judicial deference to legislative determinations of "public use" may have had some conceivable justification. The text of the Constitution did not elaborate on the words "public use," and courts may have worried about judicially second-guessing elected officials' determinations of what is and is not a valid public use. I agree with Justice Thomas that the words "public use," standing alone, are readily amenable to judicial application and provide no valid basis for judicial deference to other branches of government. *See Kelo*, 545 U.S. 469 (Thomas, J., dissenting). But even if reasonable minds can disagree on what an unexplained constitutional reference to "public use" means, in Texas that is now a purely academic question. We no longer have a Constitution containing an unexplained "public use" requirement. We now have a Constitution containing the same "public use" requirement that has always been there *and* a further requirement that the taking must be for "the ownership, use, and enjoyment of the property . . . by . . . [the government] . . . or the public at large." TEX. CONST. art. I, § 17(a).

By amending the Constitution after *Kelo* to explicitly require that condemnation of private property be for the public's "ownership, use, and enjoyment of the property," Texas voters rejected the deferential judicial standards that gave rise to *Kelo* and that existed not just in U.S. Supreme

7

Court precedent but in this Court's precedent. The new constitutional language clarifies that "public use," not "public purpose," is the touchstone. And the text's new "ownership, use, and enjoyment" requirement provides a judicially administrable legal standard under which deference to the condemnor has no justification. The difficulties that may arise in the application of this text to particular cases are no different from the usual problems courts confront when applying constitutional provisions or statutes. The amended subsection (a) is surely clearer than many parts of the Tort Claims Act or other challenging legal texts courts routinely apply without deferring to the opinions of legislatures or city councils. A governmental body's declaration that its proposed taking satisfies this text is nothing more than one litigant's expression of belief in its own litigating position. I can imagine no valid basis for a court to afford any deference whatsoever to a city council's opinion on whether the city's invasion of "the sacred and inviolable rights of private property" complies with the amended Texas Takings Clause. 1 WILLIAM BLACKSTONE, COMMENTARIES *134–35.

Because there is no good reason to defer to the city's opinion that it complied with the Constitution, there is also no good reason to shift the burden of proof to the property owner. The government is the plaintiff in a condemnation case. *See* TEX. PROP. CODE § 21.012. Like any other plaintiff, it ought to be required to prove its case. One element of that case is compliance with Article I, Section 17, which still requires a showing—as it always has—that the taking is for a public use. This Court previously described the existing "public use" requirement as follows:

> This Court has defined public use in similar circumstances as when the public obtains some definite right or use in the undertaking to which the property is devoted. Public use, however, does not include a benefit to the public welfare or good under which any business that promotes the community's comfort or prosperity might be benefitted from the taking.

8

*Whittington*, 384 S.W.3d at 779 (citations omitted).  Under the amended Article I, Section 17, these and other previously announced standards governing "public use" remain in effect.  The Constitution now requires at least two more discrete showings from the condemnor—that its taking is for both public ownership and public enjoyment.  Whether those showings will be easy or difficult for the government to make will depend on the case.  The contours of the previously unexplored public-ownership and public-enjoyment requirements cannot be fully enunciated *ex ante*.  Courts should start with the basic principle that the constitutional text means what it says. *Cramer v. Sheppard*, 167 S.W.2d 147, 154 (Tex. 1942) ("[T]hose who are called upon to construe the Constitution are not authorized to thwart the will of the people by reading into the Constitution language not contained therein, or by construing it differently from its plain meaning.").  Beyond that, the application of this new constitutional text to various factual scenarios must be litigated, and such litigation may yield judicial precedent that further illuminates the text.

Another quirk of the Court's approach is its cabining of a property owner's constitutional defenses to "fraud, bad faith, and arbitrariness."  These three labels understandably confuse litigants and lower courts because, particularly in the case of fraud, they can mean something entirely different in the condemnation context than they do elsewhere.  It should be no surprise that the court of appeals "mistakenly" defined fraud to mean "any act, omission or concealment, which involved a breach of legal duty, trust or confidence, justly reposed and is injurious to another, or by which an undue and unconscientious advantage is taken of another."  559 S.W.3d 192, 201 (Tex. App.—Dallas 2017) (quoting *Malcomson Rd. Util. Dist. v. Newsom*, 171 S.W.3d 257, 269 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)).  In other words, the court of appeals mistakenly thought fraud meant fraud.  Only a very careful examination of the precedent—

skipping over the cases that make the same mistake the court of appeals made—would have revealed that, when it comes to condemnation cases, fraud really means that "contrary to the ostensible public use, the taking would actually confer only a private benefit." *Ante* at ___ (quoting *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 629 n.9 (Tex. 2008)).[3] An important consideration, to be sure, but one that sounds little like fraud.

This odd mislabeling of a property owner's three defenses—fraud, bad faith, and arbitrariness—not only confuses all involved, it also stacks the deck against the property owner with both judge and jury by requiring him to allege and prove what sounds like nefarious behavior by the condemnor when all he really wants to do is argue that the taking does not comply with the Texas Takings Clause. Add that burden to the requirement of deference to the condemnor, and it becomes difficult to imagine a property owner successfully vindicating his constitutional right to be free from prohibited takings.

Where these three affirmative defenses draw their constitutional provenance—other than the Court's say-so—remains unclear. None of our cases explain why these three are the *only* defenses available to property owners. And none of our cases explain why property owners, unlike all other litigants, are not free to make any inventive arguments they can think of to defeat the government's claim that its taking of their property complies with the Constitution. The reasoning

---

[3] There are at least two problems with this formulation of the "fraud" standard. First, it juxtaposes "public use" and "private benefit" as though they were opposites. But public uses can have both public and private benefits, as can private uses. "Ownership, use, and enjoyment" are the textual touchstones. Introducing the concept of "benefit" confuses rather than enlightens. Second, requiring a property owner to show that the taking confers *only* a private benefit means he must show that it confers zero public benefits. It is nearly impossible to imagine a taking that would fail this standard, even if the "ownership, use, and enjoyment" of the property were purely private. The taking at issue in *Kelo*, for instance, probably provided some secondary public benefits. That does not mean it would satisfy the Texas Constitution. If the mislabeled fraud defense is here to stay, a more helpful formulation comes from *Whittington*, which described fraud as "the taking of property for private use under the guise of public use." 384 S.W.3d at 779.

10

seems to be that because deference must be afforded the condemnor's determinations due to the difficulty in making judicial determinations of public use, only these limited defenses should be countenanced. Thus, like the deference to the government and the burden-shifting, the limitation on defenses also seems to derive from a single source at the root of the Court's precedent—the notion that it is difficult for courts to know what "public use" means. That may have been the case before 2009, though I doubt it. After 2009, the voters have resolved the difficulty by telling us exactly what they mean. They mean to authorize takings "only if the taking . . . is for . . . the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by . . . the State, a political subdivision of the State, or the public at large." TEX. CONST. art. I, § 17(a). They expect us to apply their Constitution as they amended it, not as we previously interpreted it prior to their amendment. We should try to do that.

* * *

Neither the parties nor the court of appeals has yet considered whether the City's taking of KMS's property complies with the Texas Takings Clause without the confusing and unnecessary overlay of court decisions that did not consider the Clause's new language. As described above, I would jettison the superseded precedent, eliminate deference to government declarations of public use, treat condemnors like regular plaintiffs, treat property owners like regular defendants, and otherwise normalize the judicial standards governing condemnation cases. I would then remand

11

to the trial court to allow the parties to argue over how the amended Texas Takings Clause applies to their case. Because the majority does otherwise, I respectfully dissent.[4]

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** May 17, 2018

---

[4] I concur in the majority's disposition of KMS's arguments under section 2206 of the Government Code. I also join the majority's disposition of KMS's argument that the taking was not "necessary" under section 251.001 of the Local Government Code. Section 251.001 itself commits the necessity determination to the condemning local government: "When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public use to acquire public or private property, whether located inside or outside the municipality, for any of the following uses: [list of uses]." LOC. GOV'T CODE § 251.001(a). Unlike the constitutional public use requirement, the statutory necessity requirement is textually committed to the discretion of the governmental body. Judicial deference is not just appropriate, it is required, because under the statute a municipality may exercise the right of eminent domain "when the governing body of a municipality considers it necessary," not when a court or a jury does. Of course, the legislature has no authority to authorize a municipality to violate the Constitution, no matter what the municipality considers necessary. Article I, Section 17 is an absolute limit on municipal condemnation authority, even if that authority is exercised in conformance with section 251.001. Given the statutorily required deference to the City's statutory necessity determination, I have no objection to applying the Court's burden-shifting approach and the "fraud, bad faith, and arbitrariness" analysis to the necessity question.

12