In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00148-CV

_____

ARTURO SCHOONEWOLFF, Appellant

V.

VAN CHOATE, TUFFY'S, INC., AND HUSHPUPPIES, INC., Appellees

On Appeal from the 163rd District Court
Orange County, Texas
Trial Cause No. B190158-C

MEMORANDUM OPINION

Arturo Schoonewolff ("Schoonewolff") sued his employer, Van Choate

("Choate"), and Choate's solely owned corporations, Tuffy's, Inc. ("Tuffy's")[1] and

Hushpuppies, Inc. ("Hushpuppies")[2] (collectively, "Appellees") for violating the

---

[1]Exhibits in the record list the name of this entity alternately as "Tuffys," "Tuffy's Inc.," or "Tuffys Inc."

[2]Exhibits in the record list the name of this entity alternately as "Hushpuppie Seafood Inc" or "Hushpuppy Seafood Inc."

1

Fair Labor Standards Act ("FLSA"). He sought $239,041.16 for three years of back pay and overtime, attorney's fees, and costs. Following a bench trial, the trial court entered a Final Take Nothing Judgment from which Schoonewolff appeals. In three issues, Schoonewolff asks whether: (1) he was a non-exempt employee as a matter of law; (2) he ever performed work for which he was not properly compensated; and (3) the trial court erred in ruling that he failed to provide sufficient evidence to support his claim for unpaid overtime under the Fair Labor Standards Act ("FLSA") when the evidence conclusively establishes the opposite. As discussed below, we affirm the trial court's judgment.

## BACKGROUND

Choate owned several restaurants over the years, including Tuffy's and Hushpuppies. Schoonewolff began working for Choate in 1999. Schoonewolff alleges that from 2016 through early 2019, Choate violated the FLSA by failing to pay him overtime. In 2016 and 2017, Schoonewolff worked for Hushpuppies, which was in Port Arthur, and in 2017, he began working for Tuffy's in Mauriceville. His duties were the same at Tuffy's and Hushpuppies. Both Tuffy's and Hushpuppies had separate divisions, a restaurant division and a catering division. The restaurant division served customers "home cooked" meals in the restaurant, whereas the catering division handled "pre-cooked" foods that simply needed to be prepared and were typically delivered to local refineries.

2

During the relevant timeframe, Schoonewolff was a salaried employee. Appellees contend that he ran the catering division and was an exempt employee, so he was not entitled to overtime pay. At trial, Appellees witnesses disputed that Schoonewolff worked the hours he claimed during the relevant period and that he was improperly compensated. Schoonewolff disputes that he is an exempt employee, and asserts he worked overtime from 2016 through early 2019, when he quit, for which Appellees failed to pay him overtime. Thus, he contends that Appellees violated the FLSA.

The parties tried the case to the bench.

## Trial Evidence

### Testimony of Van Choate

Choate testified that Schoonewolff began working for him in 1999, when they took over the Cajun Cookery together, but that restaurant closed after Hurricane Rita. He also owned Tuffy's, Inc. and Hushpuppies, Inc., and Schoonewolff worked for each company at different times. In 2016, Schoonewolff worked only for Hushpuppies, in 2017, he worked for Hushpuppies and Tuffy's, and in 2018, he worked only for Tuffy's. Choate's wife handled the restaurants' business and financial affairs, and Choate handled daily operations. Without specifying the restaurant, Choate testified that Schoonewolff's duties included inventory, cooking, food preparation, and reporting to Choate. He explained that Schoonewolff did not

3

work in the Tuffy's restaurant, because he could not read English and take orders. Choate testified that during the relevant period, Choate had a distinction between the restaurant business and catering business, Schoonewolff was over catering and only reported to Choate.

Schoonewolff's duties at Tuffy's included cooking for the catering side of the business and cleaning. Choate testified that sometimes Schoonewolff cleaned the kitchen and took out the garbage for Tuffy's restaurant and did things for the businesses outside the catering realm but did not specify a timeframe. He testified that Schoonewolff used the Tuffy's kitchen for the catering business, and he was supposed to have it cleaned and ready for the restaurant employees by the time they arrived at work around 8:30 a.m. Choate testified that Schoonewolff cooked the catering meals from 5:30 a.m. until 8 a.m. Monday through Friday, and his other duties included putting the catering food in warmers so the hourly employees could package it. If Schoonewolff completed his duties, he would be done around 1 p.m., which was about seven and a half hours, but he had no set schedule; however, Schoonewolff stopped completing his duties. Choate testified that when Schoonewolff left, Choate took over the catering division, and it normally took him only three to four hours to do all the work Schoonewolff did. Choate testified he did not "track" Schoonewolff, so he did not care if it took one hour or five to get the

4

work done as long as it was done. Schoonewolff was not completing the job, though, and the restaurant's cooks were "irate."

Choate handled the contracts with the catering customers, pricing, invoicing, and built the quotes in consultation with Schoonewolff. Choate testified that Schoonewolff hired people for the catering business, told Choate how many people he needed for a job, and Schoonewolff would let them go after each job. Choate said that he approved the termination decisions based on Schoonewolff's recommendations and never reversed Schoonewolff's staffing decisions.

Choate testified they paid time and a half to hourly employees who worked more than forty hours per week. He said that Schoonewolff was never required to receive overtime pay, and although Schoonewolff's pay stubs showed he worked forty hours every week, Schoonewolff was always a salaried employee and never considered an hourly employee. Choate explained that Schoonewolff's pay stubs always showed forty hours, because that is how the accountant's software wrote the checks when employees were salaried. When determining Schoonewolff's job designation, a lawyer and CPA advised Choate regarding Schoonewolff's status. Based on that advice, Choate felt it was appropriate to pay Schoonewolff a salary. Schoonewolff was involved in the conversations and agreed to be paid a salary.

All the other employees in the restaurant except Choate, his wife, Schoonewolff, and the kitchen manager were hourly workers. Occasionally,

Schoonewolff helped with catering events on the weekend, but when he did, Choate always paid him extra, sometimes with cash and sometimes with check. He explained that if there was not a refinery turnaround, the catering volume was much less during the relevant period. Even if Schoonewolff prepared all the meals that day, Choate testified, "No way it should take him" eight hours, "and I know it wouldn't take me that long." Choate was at the restaurant every day and denied that Schoonewolff worked the hours he claimed. Choate testified that Schoonewolff worked on catering only and had "[z]ero" restaurant duties. Choate said that he was in the restaurant with Schoonewolff, and Schoonewolff's testimony where he claimed to have worked from 2 a.m. until 11 p.m. except breakfast and an hour at lunch was untrue.

Choate testified that Schoonewolff's primary duty was managing catering, which was a separate division from Tuffy's and Hushpuppies. Choate agreed that most of Schoonewolff's work between 2016 and 2019 involved blue collar duties, like food preparation, cleaning, and taking out the garbage versus the administrative stuff for catering. Choate testified that Schoonewolff regularly directed the work of two or more full-time employees. Schoonewolff began making $800 per week in 2018.

Choate never controlled Schoonewolff's hours, and Schoonewolff took off as many as his schedule allowed. Choate testified he did not care what Schoonewolff

did if he finished his duties. He disagreed that Schoonewolff worked more than forty hours per week at Tuffy's from 2017 to present. Nevertheless, he testified that there were times outside the relevant period when Schoonewolff worked more than forty hours a week and he was not paid overtime, because he was paid a salary. He also agreed there were times when Schoonewolff worked seven days a week depending on how the catering jobs played out, and sometimes he worked on Sunday, "if he didn't complete his duties[.]" Choate did not know when Schoonewolff started working in the mornings, but by 7 or 7:30 the food was cooked, and "in an hour to two hours at the most, Schoonewolff could have his stuff done." Choate explained that when Schoonewolff finished cooking about 8 or 8:30 a.m., he should have handled clean up from the catering so the restaurant kitchen crew could come in, which would take about another hour. After that, Schoonewolff left the restaurant. Choate testified that most days, Schoonewolff left by 8:30 a.m., despite having a responsibility to be there on call for Choate, and this continued until Schoonewolff quit.

Choate said that Schoonewolff never asked for overtime, and Tuffy's had a clock for hourly employees that tracked whether they were entitled to overtime. Schoonewolff knew about this clock and could have used it but never did. Choate testified that his wife asked Schoonewolff to use the clock, because she did not believe he worked eight hours per day, but he became upset and refused. He said

7

that Schoonewolff left work for hours each day to go across the street and do other things. When Schoonewolff quit, he was not completing the required cleaning, which caused problems when the restaurant employees arrived and found a mess. The restaurant employees were unhappy, and eventually, Choate's wife began washing dishes, and Choate began taking out the trash. The cleaning up would have been within Schoonewolff's work hours, if he worked eight hours a day. Choate testified he made one statement to Schoonewolff about cleaning up, and Schoonewolff became very angry and quit immediately. Two weeks later, Schoonewolff asked for his job back, but Choate did not rehire him.

Choate provided Schoonewolff a place to live on the Tuffy's premises for free and paid his utilities, as well as provided him food. Although Schoonewolff lived on the premises, Choate disputed that he was available around the clock for work.

**Testimony of Arturo Schoonewolff**

Schoonewolff is from Honduras and in 1998, he came to the United States and obtained a work permit. Schoonewolff worked for Choate from 1999 until early 2019. Choate hired him for his first job in the United States in 1999 at the Cajun Cookery. When he worked at the Cajun Cookery, he did food preparation, cleaning and cooking and worked in the catering business, but Cajun Cookery was damaged in 2005 during Hurricane Rita and closed. Schoonewolff continued working for Choate after the Cajun Cookery closed and worked for him when he opened Tuffy's

8

the first time in 2005. Schoonewolff testified that he worked for Hushpuppies catering business in 2016 and 2017, and they prepared food for refineries. In 2017, his paycheck changed from Hushpuppies to Tuffy's.

Schoonewolff testified that at Hushpuppies catering, "there was not a set shift; but the earliest that I would get up so that everything that had to be done would get done that would be 2:00 a.m." When he arrived at 2 a.m. at Hushpuppies, he prepared the food for that day's catered lunch plates. Sometimes preparing and cooking, depending on the quantity, took three to four hours, but "but six hours for everything." He testified that if he got up at 2 a.m., he was through at 8 a.m. Schoonewolff said that at 8 a.m., the ladies came and washed dishes. Then, he started preparing for the next day when the ladies left to deliver food around 10:30 a.m. When he began preparing food for the next day at 10:30, it took him five to six hours, but he took a break for an hour or two around 1 or 2 p.m., so he finished preparing the food at 6 or 7 p.m. After that, he sometimes washed dishes and quit working about 7 or 8 p.m. He went to sleep between 8 and 10 p.m. and stayed in a motorhome at the restaurant, which Choate furnished.

Schoonewolff moved from Port Arthur to Mauriceville in October 2017 to work at Tuffy's. At Tuffy's, they continued delivering meals to the refineries. He testified that at Tuffy's, "there was not an established time for him to" start working, and sometimes, he would get up at 1 or 2 a.m. Beginning in 2019, he saw Choate

9

almost every day, but in 2017 and 2018, he only saw Choate about three or four times a week. In the mornings, Schoonewolff usually saw Choate between 7 and 8 a.m., and if he started at 2 a.m., he worked six or seven hours before he saw Choate. In the mornings, for the catering business, he prepared the machine to cook, and he put the pre-prepared foods into the machine to cook them. He explained that he cooked meat the day before, which he warmed with the pre-prepared food in the "pit machine" which took two to three hours. The food had to be ready to plate by 9 a.m.

In the seven hours between 2 a.m. and 9 a.m., he prepared for the next day to "gain time." Sometimes, a lady came to help him at 6 a.m., but he worked by himself before she arrived. At 9 a.m., the ladies plated the food, which took an hour to an hour and a half, then they delivered it to the plants. Sometimes, he helped with the plates. When they finished the plates at 10 or 10:30 a.m., he received merchandise, cleaned, and took out the trash, which took two to three hours.

He claimed that when he finished the catering work, he worked on the restaurant side cooking shrimp and crawfish, preparing oil and sauces, preparing batter for the fish, and cooking gumbo, although the restaurant had its own cook and manager. He testified that sometimes he went to the deli across the street at 6 a.m. before the others arrived and again in the afternoon. In the morning, he bought breakfast at the deli but stayed "no more than 20 minutes[,]" although he later contradicted this by claiming he stayed no longer than an hour. When he went to the

deli in the afternoon, he stayed an hour to an hour and a half and ate. Schoonewolff testified that starting at Tuffy's in October 2017, Monday through Friday, he worked fourteen to fifteen hours per day. He said he stopped working at 1 or 2 p.m., then returned later to work six or seven more hours; sometimes he "would have to work all the way to 11 at night because there was lots of work." On most days, though, he stopped working at 8 p.m. Schoonewolff testified that he worked nearly every Saturday, too, and there were special catering jobs. This seemingly contradicted his initial testimony that he did this only "sometimes." He then testified he worked two Saturdays per month. Schoonewolff testified he worked every Sunday preparing the food for Monday, which took four to five hours. He claimed this was the same at Tuffy's and Hushpuppies. Elsewhere, he testified that he worked on the weekends "[f]from time to time." He said he also worked during the night to prepare food for the next day. He said he worked more hours than anyone else at Tuffy's.

Schoonewolff denied that he ordered the food, prepared the menus or told Choate what to order. Schoonewolff also denied that from 2016 to 2019, he hired or fired anyone in the catering business or told Choate who to hire or fire. Schoonewolff denied that Mrs. Choate asked him to use the time clock. He also denied that Choate asked him to use the clock, but Schoonewolff knew it was there and that was how Choate determined overtime. He claimed he asked Choate if he could punch the clock at Hushpuppies and Tuffy's. He considered himself an hourly employee but

11

never documented the hours he claimed he worked overtime or gave it to Choate. Schoonewolff said he could not provide a date that he worked overtime and was not paid, because "it was practically all during the time that I worked with him." Ultimately, he testified that he worked overtime every day for nineteen years. Schoonewolff said he worked every day from 2 a.m. to 11 p.m. after he came from Port Arthur to Tuffy's, although he immediately contradicted this and said he did not work every day from 2 a.m. to 11 p.m. Elsewhere, he testified that he worked from 2 a.m. to 11 p.m. most days. He inconsistently testified that he slept three hours per night, then on average four to five hours per night. He also did not seem to understand the relevant time in question was 2016, 2017, and 2018.

Schoonewolff denied he was paid a salary and claimed the amount he received each week varied. He contradicted this testimony and said he received the same amount every week, minus taxes, and he never reported other income on his tax return, including the trailer, monthly utilities, and food Choate provided. When he quit, he made $800 per week. Schoonewolff's pay was never reduced for rainouts or holidays they did not work. He testified he napped "here and there" but denied it was every day, although his salary was never reduced for the naps.

Schoonewolff said he might have had holidays off but did not take any vacation between 2016 and 2019. Schoonewolff quit working for Choate in February 2019, because he claimed that Choate "disrespected" his mother. He disputed

Choate's testimony that just because he lived there did not mean he worked all the time and claimed he worked "the majority of the time."

**Testimony of Wendy Bonilla**

Wendy Bonilla ("Bonilla") worked with Schoonewolff at Hushpuppies catering in Port Arthur for about two years ending in 2015. She did not remember the hours she worked when testifying but looked at an earlier statement she gave and said she worked from 4 a.m. to 4 or 5 p.m. sometimes six days a week and when she worked, Schoonewolff was always with her. She was an hourly employee and did not recall who hired her but testified she worked with Schoonewolff for Choate. Bonilla testified that she worked when Schoonewolff told her, and he was her boss or supervisor. She testified that Schoonewolff never left during the day while she was there.

**Testimony of Brenda Castro**

Brenda Castro ("Castro") operated a deli in the gas station across the street from Tuffy's. She testified that Schoonewolff began as a client but is now her friend and "like a father" to her. In 2017, she worked at the deli from 4 a.m. to 8 p.m. five days per week. She testified that in 2017, when she arrived at work at 4 a.m., she saw Schoonewolff every day; he was outside throwing out the garbage. Schoonewolff did not come to the deli for breakfast every day, but when he did, he came around 6 a.m. and stayed no more than five minutes. He returned around noon,

13

ate and rested for about thirty-five minutes to an hour. She saw him through the gas station windows across the street "washing out the mop" or doing other things. She also saw him putting out the trash when she left in the evenings around 8 p.m., "practically every day, the majority of the time." She could not say what he did inside Tuffy's the rest of the day. She did not know what he did on Saturday or Sunday. Once in 2018, she went to Tuffy's to help Schoonewolff prepare 300 burritos, because he was not feeling well. She denied that Schoonewolff did any work in the deli while he worked for Choate, but after he left, he helped in the Deli sometimes.

**Testimony of Josette Choate**

Josette Choate ("Josette"), Van Choate's wife, also testified.[3] Josette testified that she managed servers, cashiers, hostesses and did accounts payable and receivables, while her husband oversaw the kitchen staff and catering. From 2016 until Schoonewolff left, she was with Hushpuppies or Tuffy's full time. She explained that some refinery catering jobs were done through both Hushpuppies and Tuffy's, but they closed Hushpuppies completely at the end of 2017, then all the catering business was transferred to Tuffy's.

Josette explained that they divided the restaurant from the catering, and Schoonewolff ran the catering division. Other than input about where to deliver the

---

[3]For purposes of clarity, we refer to Mrs. Choate by her first name.

14

clients and the menu, he took care of everything else. She said that he hired and fired people, which they never reversed. When he quit, Schoonewolff made $800 per week.

Josette testified that Schoonewolff normally arrived first to the restaurant. She usually arrived at the restaurant around 7 or 8 a.m. Choate arrived earlier than she, and the baker arrived at 6 a.m. The cooks for Tuffy's restaurant arrived at 8 or 8:30 a.m. She did not know when Schoonewolff started preparing the catering food, because he did not punch a clock, had "an open schedule[,]" and "worked when he needed to work; and when he was not needed to work he didn't work." Josette and Choate "had a big disagreement" because she wanted Schoonewolff to punch the clock like everyone else to have a record of the hours he worked. She disputed that Schoonewolff worked from 2 a.m. to 11 p.m. most days and explained why that was impossible. Josette said that she closed the restaurant most nights at 11 p.m., and he was never there cleaning nor preparing for the next day when she did. Tuffy's was open until 9 p.m. every night except Sundays, when they closed at 4 p.m.

There was no room in the kitchen for the restaurant staff and the catering staff to work at the same time; catering orders were done before. Since Schoonewolff did his catering work in the same kitchen the restaurant used, if he worked as he claimed, he would be in the restaurant, but she never saw him except on special jobs. Josette testified there were some special catering jobs when he worked extended hours, "but

15

not on a normal day-to-day schedule." Although there may be exceptions, Schoonewolff worked significantly less than eight hours most days, and overpaying Schoonewolff caused issues in the Choates' marriage. She said that Schoonewolff could not work as he described without them seeing it, because it would have occurred in the restaurant kitchen.

They paid Schoonewolff more than the restaurant manager, and Josette tried to get Choate to have him return during dinner service to help with the dishes, but Choate was "very adamant about keeping the two separated." She explained that whatever hours it took Schoonewolff to finish the job was what he was expected to work, and the weeks he worked more than forty hours, they paid him "extra" as a "bonus" but not at an hourly rate. Josette testified that if Schoonewolff streamlined his time, he would not normally work over eight hours a day.

She also denied that he handmade foods for the restaurant and explained that some of the foods he described making were at the Cajun Cookery and the first time they owned Tuffy's between 2005 and 2010. He never worked in the restaurant during the relevant period and was separate from the restaurant. She explained that he could not read English well enough to cook and keep up with the orders on a dinner service or lunch service.

They relied on a clock to determine whether somebody worked overtime. She testified that she asked Schoonewolff to punch a clock and explained that every

16

point-of-sale system they had could act as a time clock, which Schoonewolff was "very familiar with[.]" She even set his code as his birthday so he could clock in easier, "and it just did not happen." She testified that everybody that entered the door, including their kitchen manager, punched a time clock, except Schoonewolff.

Josette testified that in the nineteen years he worked for them, Schoonewolff was never an hourly employee. They wanted to ensure he had a set income amount no matter what he worked, and many weeks, he did not work forty hours. When they set up their business, they consulted lawyers and CPAs and were under the good-faith belief it was appropriate for Schoonewolff to be salaried. After consulting various experts, she believed it was appropriate to have people in the restaurant who have managerial duties as salaried, which is what other restaurants do.

Most of the time, Choate was the only one who drew a salary, and Josette worked for free. Other than Choate, Schoonewolff was the highest paid employee at Tuffy's and Hushpuppies during the relevant time. Schoonewolff never told them he felt he was entitled to overtime pay and had never told them he worked overtime at all.

Josette explained that once Schoonewolff completed his catering duties, he had no other duties, although there were some exceptions where they had big catering jobs. They were only "really busy" for refinery turnarounds that happened twice a year and lasted four to six weeks, so when Schoonewolff said he prepared

17

200 to 400 meals, that was for turnarounds, not the entire three years. The rest of the time, the catering business was light. Josette testified there was no catering on Friday, Saturday or Sunday. She disputed that he worked on Fridays, Saturdays, and Sundays, and that he was preparing food sixteen hours a day, seven days per week, because they "did not have the business to support that." She did not believe he routinely worked even eight hours a day unless they had a big catering job. She described where he spent much of his days, including a "little makeshift office" in a storage room off the side of their banquet room using his laptop, but he was not working. Josette testified Schoonewolff could work at his leisure, but if he was working all those hours, she or Choate would have structured his schedule.

Josette testified that toward the end of Schoonewolff's employment, she questioned Choate, because she felt Schoonewolff was overpaid. Josette testified they provided Schoonewolff with other benefits, including satellite television service, so he had Spanish channels, internet service, and a laptop. Once, she figured the financial value of the additional benefits was "12 to $1500 a month just for the rent, compared to what he paid before with the electricity, water, sewer, internet, food, and clothing."

Josette discussed her understanding of why Schoonewolff quit. They received complaints from the restaurant staff that when they arrived at 8 or 8:30 a.m., the kitchen was dirty and that Schoonewolff left a mess. They complained they did not

18

have time to clean for him. When Choate approached him about it and told him he needed to stay and clean the dishes, Schoonewolff became angry, took off his apron, and quit. The first time that she ever heard Schoonewolff quit because Choate disrespected his mother was during trial. She said that was the first time Choate acted authoritatively with Schoonewolff, and Schoonewolff acted out and said things he did not mean. Two weeks later, he returned and asked for his job back, but Choate did not give it back to him.

### Testimony of Michael DuBois, CPA

Michael DuBois ("DuBois") testified that he was the CPA for Tuffy's, Hushpuppies, and the Choates. He handled the taxes and CPA documents for Tuffy's and Hushpuppies and did their payroll. DuBois performed the CPA work for the restaurants from the beginning. They were set up as a restaurant and catering business.

DuBois had seen Schoonewolff's name on timesheets and payroll records and brought records with him to trial to refresh his recollection during trial. He testified that Schoonewolff was always classified on the timesheet as a salaried employee. DuBois explained that meant Schoonewolff was in a "supervisory capacity" and was "catering manager." He described the differences between salaried and hourly employees including "supervisory capacity, manage, . . . manage people, hire and fire, that type of stuff."

19

DuBois had to obtain documents to file proper tax returns, which included that Schoonewolff was salaried. He testified that there were a couple of managers who were salaried, including the restaurant manager. When addressing the reason why Schoonewolff's pay stub always showed forty hours, he explained that his payroll software shows forty hours on their pay stub even if they are salaried. He testified that with the software, they entered salary and that was how they prepared payroll every two weeks. DuBois said that if Schoonewolff was an hourly employee, the pay stub would not always show forty hours and would instead show the hours he actually worked. Timesheets were faxed over every week to prepare payroll, and "at the bottom of every time sheet, it's marked that he was a salaried employee with no hours." He testified that in virtually every restaurant, there were salaried employees and hourly employees. He did not know that the FLSA required salaried employees to be paid overtime if they worked more than forty hours per week, but he had never seen a salaried employee get paid for overtime in all the businesses he worked for.

**Other Evidence**

Additional evidence admitted at trial included: Schoonewolff's pay stubs; payroll records; Tuffy's tax return; Hushpuppies' tax return; Choate's affidavit; and catering invoices.

## Trial Court's Judgment and Findings of Fact and Conclusions of Law

The defendants moved for directed verdict after Schoonewolff finished presenting his evidence and argued there was insufficient evidence to determine that Schoonewolff worked overtime. The trial court initially denied the motion but asked for additional briefing on the FLSA after the evidence closed. The trial court later entered a take nothing judgment for Choate, Tuffy's, and Hushpuppies. In a letter explaining its ruling, the trial court noted that "Schoonewolff has failed to provide sufficient evidence that he performed work for the defendants for which he was not compensated[,]" and "further finds that there was insufficient evidence for the court to draw a reasonable inference as to the specific amount of time the plaintiff worked each day for the defendant." The court also found that

> the plaintiff's testimony was inconsistent as to hours he worked and failed to provide the proper details to show any overtime worked, much less the specific amount. Mr. Schoonewolff testified, at different times, that it would take 2 hours to prepare food, 3 hours to prepare food, 4 hours to prepare food and 5 hours to prepare food. Mr. Schoonewolff further testified that he worked from 2:00 a.m. to 11:00 p.m. leaving him 3 hours to sleep each night for over 3 years. The court finds this testimony unbelievable and unreliable especially when you consider the details of the work that was brought to the court's attention. These are just a few examples of Mr. Schoonewolff's testimony that the court used to base its decision. The further testimony that the plaintiff was not in the kitchen of Tuffy's restaurant during it's [sic] normal restaurant hours further leads to the believability of the defendant's testimony that the plaintiff was able to complete his work in a time frame that did not require overtime hours to be worked.

21

At Schoonewolff's request, the trial court issued Findings of Fact and Conclusions of Law, which provide in pertinent part:

**Findings of Fact**

16. The court found that Plaintiff Arturo Schoonewolff failed to provide sufficient evidence that he performed work for the Defendants for which he was not compensated.

17. The court found there was insufficient evidence presented by Plaintiff for the court to draw a reasonable inference as to the specific amount of time Plaintiff worked each day for Defendants.

18. The court found that Plaintiff's testimony was inconsistent as to the hours he worked and failed to provide proper details for the overtime worked or specific amounts.

19. The court found Plaintiff's contention that he would work from 2:00 a.m. until 11:00 p.m. leaving him three hours to sleep each night for three years to be not believable and unreliable in light of the evidence of the details of his work and the evidence that he was not working in the restaurant during its normal restaurant hours.

20. The court found, based on the evidence, Plaintiff was able to complete his work in a time frame that did not require overtime hours.

21. The court found it not necessary to rule on the other defenses raised by Defendant.

. . .

**Conclusions of Law**

1. The court had jurisdiction to hear this lawsuit as stipulated by the parties.

2. An employee who brings suit under the FLSA for overtime compensation has the burden of proving that he performed work for which he was not properly compensated.

3. The burden is met by proof that he has in fact performed work for which he was not properly compensated and by sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

4. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed, or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.

5. If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may be only approximate.

Schoonewolff timely appealed.

## STANDARD OF REVIEW

In a bench trial, the trial court, as factfinder, is the sole judge of the witnesses' credibility and weight of the evidence and is tasked with resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004) (citation omitted); *see also Morrell v. Morrell*, No. 09-20-00086-CV, 2022 WL 959943, at *12 (Tex. App.—Beaumont Mar. 31, 2022, pet. denied) (mem. op.). The factfinder may choose to believe one witness over another, and we do not substitute our judgment for the factfinder's. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (discussing in context of a jury trial); *see also Morrell*, 2022 WL 959943, at *12. When a trial court makes specific findings of fact and conclusions of law after a bench trial and a reporter's record is before the appellate court, we sustain the findings if evidence supports them, and we will review the legal conclusions drawn from the facts to determine their correctness. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Morrell*, 2022 WL 959943, at *12. "Findings of fact 'have the same force and dignity' as a jury's verdict and are

23

reviewable under the same standards of legal and factual sufficiency." *Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (quoting *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)); *see Morrell*, 2022 WL 959943, at \*12 (citation omitted).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller*, 168 S.W.3d at 827. When a party attacks the legal sufficiency of an adverse finding on an issue which he has the burden of proof, he "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citation omitted). When we review a "matter of law" challenge, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *See id.*; *see also Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). If no evidence supports the finding, the reviewing court will then examine the entire record to determine whether the contrary proposition is established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. The point of error will be sustained only if the contrary proposition is conclusively established. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

In a factual sufficiency review, we examine all the evidence, and we will set aside the judgment if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see also Unimex Logistics, LLC v. Tim Neff Towing, Inc.*, No. 09-16-00275-CV, 2018 WL 2339623, at *4 (Tex. App.—Beaumont May 24, 2018, no pet.) (mem. op.) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). Unlike a legal-sufficiency review, a factual-sufficiency review requires us to review all the evidence in a neutral light. *See Cain*, 709 S.W.2d at 176.

"We review a trial court's conclusions of law as legal questions, *de novo*, and will uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence." *Morrell*, 2022 WL 959943, at *12 (citing *BMC Software Belg.*, 83 S.W.3d at 794); *see also Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). If we determine a conclusion of law is erroneous, we will not reverse if the trial court rendered the proper judgment. *See BMC Software Belg.*, 83 S.W.3d at 794; *see also City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citation omitted).

## ANALYSIS

We begin our discussion with issues two and three, because whether we address issue one and the affirmative defense that Schoonewolff was an exempt employee depends on our ruling on each of those issues. In issue two, Schoonewolff

25

asserts that we should reverse the trial court's judgment because he provided sufficient evidence to support his claim for unpaid overtime under the FLSA. In issue three, he complains that the trial court erroneously applied the "just and reasonable inference" test and that he has conclusively established his claim for unpaid overtime. In support of these issues, he challenges specific findings the trial court made. We address these issues together, as the evidence necessary to their resolution overlaps.

**FLSA and Applicable Law**

Schoonewolff sued for unpaid overtime under the FLSA. *See* 29 U.S.C. § 216(b) (outlining cause of action and allowable damages). The FLSA states,

> Except as otherwise provided in [section 207], no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

*Id.* § 207(a)(1); *Tooker v. Alief Indep. Sch. Dist.*, 522 S.W.3d 545, 560 (Tex. App.— Houston [14th Dist.] 2017, no pet.) (citation omitted). "'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.'" *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (alteration in original) (quoting *Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir.1995)).

26

When an employee does not notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay overtime hours is not a violation of section 207. *Id.* (citation omitted). An employee bringing an FLSA claim based on unpaid overtime compensation, must first demonstrate that he has performed work for which he alleges he was not compensated. *See id.* An employee meets his requisite burden of proof

> if he proves that he has in fact performed work for which he was improperly compensated *and* if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may be only approximate.

*Id.* (emphasis added) (quoting *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946), *superseded by statute*, Portal-to-Portal Act of 1996, Pub. L. No. 104-188, 110 Stat. 1928, *as recognized in Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 36 (2014)). In other words, "'[u]nder the FLSA, an employer must pay overtime compensation to its non-exempt employees who work more than forty hours a week.'" *White v. Patriot Erectors, L.L.C.*, No. 23-50524, 2024 WL 3181455, at *3 (5th Cir. June 26, 2024) (quoting *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 272 (5th Cir. 2020)).

A plaintiff's burden is "easily discharged" to prove his damages of uncompensated overtime work when an employer keeps accurate records of the employee's records required by the FLSA. *Id.* (quoting *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 362 (5th Cir. 2023)). The Supreme Court developed a burden-shifting framework that applies when an employer fails to keep records, or they are inaccurate or inadequate. *See id.* (citation omitted).

> An employee bringing an action for unpaid overtime compensation must first demonstrate by a preponderance of the evidence: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due.
>
> Once the employee establishes a prima facie case, the burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."

*Johnson v. Heckman Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (quoting *Harvill*, 433 F.3d at 441) (other citation omitted).

First, "[a]n employee who claims that he was not paid this overtime rate 'has the burden of proving that he performed work for which he was not properly compensated.'" *Viet v. Le*, 951 F.3d 818, 822 (6th Cir. 2020) (quoting *Anderson*, 328 U.S. at 687); *see also Harvill*, 433 F.3d at 441. Then, if an employer does not keep the statutorily required records, the employee may establish damages by producing sufficient evidence to show the amount and extent of uncompensated

work as a matter of "just and reasonable inference." *Viet*, 951 F.3d at 822 (citation omitted). This relaxed burden "applies to damages questions only *after* an employee has met the initial burden to 'establish[ ] liability' by showing that the employee performed uncompensated overtime work." *Id.* (citing *O'Brien v. Ed Donnelly Enterps., Inc.*, 575 F.3d 567, 603 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 162 (2016); *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013)). Thus, "the ordinary burden of proof governs the threshold question of whether the plaintiff worked overtime at all." *Id.* Under the "just and reasonable inference" relaxed standard of damages, "a plaintiff need not prove 'the precise extent of uncompensated work,' though he must present more than 'unsubstantiated assertions.'" *Flores*, 73 F.4th at 362 (citations omitted); *see also White*, 2024 WL 3181455, at *4. Whether an employee is exempt from overtime pay is an affirmative defense, which the employer has the burden to prove. *See Leal v. Magic Touch Up, Inc.*, 855 F.App'x 924, 927 (5th Cir. 2021).

**Application**

In support of his issues, Schoonewolff challenges the legal and factual sufficiency of the evidence supporting the trial court's take nothing judgment. He expressly challenges Findings 17 through 20. He also by implication challenges

Finding 16 by arguing that he established he worked overtime hours for which he was not compensated.

Schoonewolff had the initial burden to first prove by a preponderance of the evidence that he has in fact performed work for which he was improperly compensated. *See Viet*, 951 F.3d at 822; *see also Harvill*, 433 F.3d at 441. Then, if he meets his burden and if his employer fails to provide accurate time records, he must produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *See Viet*, 951 F.3d at 822; *see also Harvill*, 433 F.3d at 441. Accordingly, in his legal sufficiency challenge to the trial court's factual findings, he "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts" supporting the issues. *See Dow Chem. Co.*, 46 S.W.3d at 241 (citation omitted). We first examine the record for evidence that supports the findings, while ignoring all evidence to the contrary. *See id.*; *see also Sterner*, 767 S.W.2d at 690.

In Findings of Fact 16 and 17, the trial court determined that Schoonewolff failed to present sufficient evidence that (1) he performed work for defendants for which he was not compensated and (2) for the court to draw a reasonable inference as to the specific amount of time Plaintiff worked each day for the defendants. Although characterized as factual findings by the trial court, Findings 16 and 17 are

conclusions of law, and we will review them accordingly. We first address Findings of Fact 18 through 20.

**1. Findings of Fact 18 through 20**

Schoonewolff first challenges Finding 18, "that Plaintiff's testimony was inconsistent as to the hours he worked and failed to provide proper details for the overtime worked or specified amounts." Schoonewolff testified that he could not provide a date that he worked overtime and was not paid, because "it was practically all during the time that I worked with him." Ultimately, he testified that he worked overtime every day for nineteen years. Schoonewolff said he worked every day from 2 a.m. to 11 p.m. after he came from Port Arthur to Tuffy's, although he immediately contradicted this and said he did not work every day from 2 a.m. to 11 p.m. Elsewhere, he testified that he worked from 2 a.m. to 11 p.m. most days. He inconsistently testified that he slept three hours per night, then on average four to five hours per night. He also provided conflicting testimony about the length of certain breaks and naps he took, and testified that he went and bought breakfast but stayed "no more than 20 minutes[,]" then later claiming he stayed no longer than an hour.

Schoonewolff also provided inconsistent testimony about his alleged weekend work. He testified that he worked almost every Saturday, that he stated he worked weekends only "sometimes," and he testified he worked two Saturdays per month.

31

Schoonewolff testified he worked every Sunday preparing the food for Monday, which took four to five hours, but elsewhere, he testified that he worked on the weekends "[f]rom time to time."

He also offered conflicting testimony about his pay. Schoonewolff initially denied he was paid a salary and claimed the amount he received each week varied. Yet, he immediately contradicted this testimony and said he received the same amount every week. Schoonewolff also testified his pay was never reduced for rainouts or holidays they did not work. When he quit, he said he made $800 per week. He testified he "did take a nap here and there" but denied it was every day, and he agreed his salary was never reduced for the naps.

We first examine the record for evidence that supports the trial court's finding that Schoonewolff provided inconsistent testimony, while ignoring all evidence to the contrary. *See Dow Chem. Co.*, 46 S.W.3d at 241 (citation omitted); *see also Sterner*, 767 S.W.2d at 690. Only if no evidence supports the finding, then will we examine the record to determine whether the contrary proposition is established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. As outlined above, some evidence supports Finding 18, so legally sufficient evidence supports the trial court's finding. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. The evidence supporting this finding was also factually sufficient, as it is not so contrary to the overwhelming weight of the evidence as to

32

be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Unimex Logistics*, 2018 WL 2339623, at *4. Although Schoonewolff provided some evidence supporting his claim, he provided contradictory testimony about his duties, when he worked certain hours, and whether he was salaried.

Schoonewolff next challenges Finding 19, in which the trial court found "Plaintiff's contention that he would work from 2:00 a.m. until 11:00 p.m. leaving him three hours to sleep each night for three years" was "not believable and unreliable in light of the evidence of the details of his work and the evidence that he was not working in the restaurant during its normal restaurant hours." The trial court is the sole judge of the witnesses' credibility and weight to give their testimony and can resolve conflicts in evidence. *See City of Keller*, 168 S.W.3d at 819–21; *Garza*, 164 S.W.3d at 625 (Tex. 2004); *see also Morrell*, 2022 WL 959943, at *12. In addition to the inconsistencies in Schoonewolff's own testimony noted above, other witnesses testified that it was impossible for him to work the hours he stated, particularly at Tuffy's, since they used a shared kitchen. Choate and Josette testified that they were in the restaurant during periods he claimed to have worked and did not see him. They also testified, as did Schoonewolff, that the restaurant and catering used a single kitchen. Josette and Choate explained that the restaurant staff arrived at 8:00 or 8:30 a.m., and Schoonewolff had to be done with catering, so the restaurant staff could use the kitchen. Josette also testified the restaurant did not stop serving

until 9:00 p.m., and she was there almost every night closing everything out until 11:00 p.m. and did not see Schoonewolff working.

On appeal, Schoonewolff points to Choate's testimony and Josette's testimony that some weeks he probably worked some weekends and more than forty hours but was not paid overtime. He also points to his pay stubs showing forty hours a week. Yet, he fails to provide context surrounding this testimony. Witnesses consistently testified that Schoonewolff controlled his own schedule, and he did not have a set work schedule. Choate testified that were times Schoonewolff may have worked on the weekends, if he did not complete his duties during the week. Choate also disagreed that between 2017 until Schoonewolff quit that he worked more than forty hours per week. Also, although Josette testified that he may have occasionally worked more than forty hours, he was paid "extra" for that as a bonus though not necessarily at an hourly rate. She also explained that Schoonewolff did not even work eight hours a day routinely unless they had a big catering job. Choate and the CPA testified his pay stubs always showed forty hours a week and no overtime, because he received a salary.

The trial court, as the factfinder, was free to believe Josette and Choate over Schoonewolff, and we do not substitute our judgment for the trial court's. *See Golden Eagle Archery*, 116 S.W.3d at 761; *see also Morrell*, 2022 WL 959943, at *12. We have examined the record for evidence that supports the trial court's finding

34

that Schoonewolff's testimony about the hours he worked was unreliable and unbelievable considering the other evidence, while ignoring all evidence to the contrary. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. Having done so, we conclude some evidence supports Finding of Fact 19, thus, legally sufficient evidence supports the trial court's finding. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. Despite Schoonewolff's testimony about his overtime work, multiple witnesses testified that Schoonewolff oversaw his own schedule, that he could not have worked the hours he claimed since he could not work when restaurant employees were using the kitchen, and that he rarely worked eight hours. The evidence supporting this finding was also factually sufficient, as it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Unimex Logistics*, 2018 WL 2339623, at *4.

We now address Finding of Fact 20 that Schoonewolff could complete his work in a time frame that did not require overtime hours. Choate testified that when he took over the catering division after Schoonewolff quit, it only took him three to four hours to do all the work Schoonewolff did. He also testified that there was "[n]o way" it should take eight hours to do the work. Choate also disputed that Schoonewolff's claim that he performed work for the restaurant, testifying that he had "[z]ero" restaurant duties during the relevant period and only worked on

35

catering. Josette testified that the foods he claimed to prepare for the restaurant were things they had not cooked in the five years before he quit, although he had cooked those in some of their earlier restaurants. This was consistent with Josette's testimony that she did not believe Schoonewolff was working eight hours per day except if there was a big catering order and she wanted him to use the time clock. She explained that if Schoonewolff streamlined his time, he would not have worked over eight hours per day in a standard week. Josette and Choate agreed while there may have been some occasions Schoonewolff worked more than forty hours per week, they paid him "extra" or a "bonus" for that work. Josette testified that Schoonewolff worked at "his leisure," but they staffed the restaurant in such a way as to avoid paying overtime, so if he had been working all those hours, she or Choate would have structured Schoonewolff's schedule. They also testified that he napped and although he was on the premises, he spent much of his day not working.

As described elsewhere, Schoonewolff's testimony was inconsistent with Josette's and Choate's. The trial court, as the factfinder, was free to weigh the witnesses' credibility and resolve conflicts in the testimony, and we do not substitute our judgment for the trial court's. *See Golden Eagle Archery*, 116 S.W.3d at 761; *see also Morrell*, 2022 WL 959943, at *12. We have examined the record for evidence that supports the trial court's finding that Schoonewolff could complete his work in a time frame that did not require overtime hours, while ignoring all evidence

36

to the contrary. *See Dow Chem. Co.*, 46 S.W.3d at 241; *see also Sterner*, 767 S.W.2d at 690. Having done so, we conclude some evidence supports Finding of Fact 20, and Schoonewolff, and legally sufficient evidence supports the trial court's finding. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690. Here, while Schoonewolff testified he had to work long hours to complete his duties, other evidence, including testimony from Choate and Josette contradicts this. The evidence supporting this finding was also factually sufficient, as it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Unimex Logistics*, 2018 WL 2339623, at \*4.

## 2. Conclusions of Law

We now turn to Findings of Fact 16 and 17, which are in substance conclusions of law. Those conclusions are as follows:

> 16. The court found that Plaintiff Arturo Schoonewolff failed to provide sufficient evidence that he performed work for the Defendants for which he was not compensated.
> 17. The court found there was insufficient evidence presented by Plaintiff for the court to draw a reasonable inference as to the specific amount of time Plaintiff worked each day for Defendants.

We review these conclusions of law de novo. *See BMC Software Belg.*, 83 S.W.3d at 794; *Morrell*, 2022 WL 959943, at \*12 (citation omitted). Even if a trial court's conclusion is erroneous, we will not reverse if the trial court rendered the proper judgment. *See BMC Software Belg.*, 83 S.W.3d at 794; *see also Whittington*, 384 S.W.3d 766, 779 n.10.

37

In support of issue three that the evidence conclusively established his claim for unpaid overtime under the FLSA, Schoonewolff complains that the trial court improperly applied the test when an employer fails to provide adequate records and failed to make a "just and reasonable inference." In essence, he argues that the trial court erroneously placed the burden on him to show the details and specific amount of overtime worked, although Appellees failed to keep proper records.

Schoonewolff, as the employee, first had the burden to prove by a preponderance of the evidence that he performed work for which he was not properly compensated. *See Harvill*, 433 F.3d at 441; *Johnson*, 758 F.3d at 630. Only if he did so, would the more relaxed standard of damages as a matter of "just and reasonable inference" apply. *See Viet*, 951 F.3d at 822. The trial court determined that Schoonewolff failed to provide sufficient evidence to meet his initial burden of showing that he performed work for Appellees for which he was not compensated. As explained above, the trial court's Findings of Fact are supported by the evidence, and they include that Schoonewolff's testimony was unbelievable and unreliable. While he contends Choate's testimony and Josette's testimony conclusively proves that he performed work for which he was not compensated, we disagree. While they testified that there may have been some weeks Schoonewolff worked more than forty hours, Choate disputed this occurred during the relevant time. Further, both Choate and Josette asserted that on the rare occasions he worked more than a standard work

week, he was paid a bonus. The findings depended on the trial court's credibility determinations of the witnesses, and it was free to believe Choate's and Josette's testimony while finding Schoonewolff's unbelievable. *See Golden Eagle Archery*, 116 S.W.3d at 761; *see also Morrell*, 2022 WL 959943, at *12.

It was from these factual findings that the trial court drew the conclusion Schoonewolff did not provide sufficient evidence to show that he performed work for the Defendants for which he was not compensated. Accordingly, we determine that the trial court's conclusion that Schoonewolff failed to provide sufficient evidence to meet his initial burden of proving by a preponderance of the evidence that he performed work for which he was not compensated is not erroneous. Since Schoonewolff failed to meet his initial burden, we need not reach the conclusion of law stated in Finding 17 that he provided insufficient evidence for the court to draw a reasonable inference of the specific amount of time he worked each day, since the relaxed damages standard of "just and reasonable inference" only applies if Schoonewolff met his initial burden under the traditional standard. *See Viet*, 951 F.3d at 822.

We overrule issues two and three. Having determined that Schoonewolff failed to meet his initial burden of establishing liability under the FLSA, we need not reach issue one regarding the affirmative defense that Schoonewolff was an exempt employee. *See Leal*, 855 F.App'x at 927 (treating whether an employee is

39

exempt as an affirmative defense); *see also* Tex. R. App. P. 47.1 (requiring appellate courts to hand down opinions as brief as practicable but addressing all issues necessary to appeal's resolution).

## CONCLUSION

Having overruled issues two and three and having determined that we need not reach issue one, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 6, 2024
Opinion Delivered May 29, 2025

Before Golemon, C.J., Johnson and Wright, JJ.